**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 8 1997**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

UTE INDIAN TRIBE OF THE
UINTAH AND OURAY
RESERVATION,

      Plaintiff - Appellee,

    v.

STATE OF UTAH; DUCHESNE
COUNTY, a political subdivision of
the State of Utah; ROOSEVELT
CITY, a municipal corporation;
DUCHESNE CITY, a municipal
corporation; UINTAH COUNTY, a
political subdivision of the State of
Utah,

      Defendants - Appellants,

   and

UNITED STATES OF AMERICA,

      Amicus Curiae.

No. 96-4073

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D. Ct. No. 75-CV-408-J)**

---

John W. Andrews, Assistant Attorney General (Jan Graham, Attorney General,
Carol Clawson, Solicitor General, Reed Richards, Chief Deputy Attorney General,
and Michael M. Quealy, Assistant Attorney General, with him on the brief),

Office of the Attorney General for the State of Utah, Salt Lake City, Utah, appearing for Defendant-Appellant State of Utah.

JoAnn B. Stringham, Uintah County Attorney, Vernal, Utah, on the briefs for Defendant-Appellant Uintah County.

Herbert W. Gillespie, Duchesne County Attorney, Roosevelt, Utah, on the briefs for Defendant-Appellant Duchesne County.

Robert S. Thompson, III, General Counsel, Ute Indian Tribe, Fort Duchesne, Utah (Sandra Hansen, Deputy General Counsel, Ute Indian Tribe, Fort Duchesne, Utah, and Tod J. Smith, Whiteing & Smith, Boulder, Colorado, with him on the brief), appearing for Plaintiff-Appellee.

Robert L. Klarquist, U.S. Attorney (Lois J. Schiffer, Assistant Attorney General, Edward J. Shawaker, U.S. Attorney, and Curtis G. Berkey, U.S. Attorney, with him on the brief), Department of Justice, Washington, DC, appearing for amicus curiae United States of America.

---

Before TACHA, GODBOLD,* and HOLLOWAY, Circuit Judges.

---

TACHA, Circuit Judge.

---

This appeal requires us to address once again the status of the Uintah Valley Indian Reservation. In the district court, the Ute Indian Tribe ("Tribe") sought to obtain a permanent injunction preventing the State of Utah, the counties of Duchesne and Uintah, and the cities of Roosevelt and Duchesne ("state and local defendants") from exercising civil and criminal jurisdiction on certain lands

---

*The Honorable John C. Godbold, Senior Circuit Judge, United States Court of Appeals for the Eleventh Circuit, sitting by designation.

within the original exterior boundary of the Uintah Valley Reservation in a manner inconsistent with our en banc opinion in Ute Indian Tribe v. Utah, 773 F.2d 1087 (10th Cir. 1985) (en banc), cert. denied, 479 U.S. 994 (1986). In opposing the injunction, the state and local defendants rely on Hagen v. Utah, 510 U.S. 399 (1994), in which the Supreme Court held, contrary to our decision in Ute Indian Tribe, that the lands in question are not part of the Uintah Valley Reservation. Notwithstanding Hagen, the district court held that it was bound under the "law of the case" doctrine to follow our mandate in Ute Indian Tribe and thus, that it was without authority to alter the existing jurisdictional boundaries as set forth in Ute Indian Tribe. In light of the inconsistency between Ute Indian Tribe and Hagen, however, the district court requested that we issue instructions on how to proceed and suggested that we construe the request as an invitation to recall our mandate in Ute Indian Tribe.

The state and local defendants appeal, arguing that (1) our en banc decision in Ute Indian Tribe does not preclude their exercise of jurisdiction over former reservation lands under the doctrines of law of the case, collateral estoppel, or res judicata and (2) Hagen effectively overruled Ute Indian Tribe, permitting the defendants to exercise jurisdiction over all the lands originally held to be within reservation boundaries. Along with their appeal, the state and local defendants have filed a motion to recall, in its entirety, our mandate issued pursuant to Ute

Indian Tribe. The United States as amicus curiae urges us to recall and modify the mandate in Ute Indian Tribe only to the extent that it directly conflicts with Hagen. We exercise jurisdiction pursuant to 28 U.S.C. § 1291. Because we conclude that the boundaries of the Uintah Valley Reservation must be redetermined in light of Hagen, we modify our holding in Ute Indian Tribe to the extent that it directly conflicts with the holding in Hagen.

## BACKGROUND

### I. INTRODUCTION

This case is unlike other reservation diminishment cases in which courts must decide whether congressional enactments opening reservation lands to non-Indian settlement have diminished or disestablished reservation boundaries. See, e.g., Solem v. Bartlett, 465 U.S. 463 (1984); Rosebud Sioux Tribe v. Kneip, 430 U.S. 584 (1977); DeCoteau v. District County Court, 420 U.S. 425 (1975); Mattz v. Arnett, 412 U.S. 481 (1973); Seymour v. Superintendent of Wash. State Penitentiary, 368 U.S. 351 (1962); United States v. Celestine, 215 U.S. 278 (1909). Over a decade ago, we answered that question when we addressed whether congressional enactments from 1902 through 1905 had the effect of diminishing the Uintah Valley Reservation. Ute Indian Tribe, 773 F.2d at 1093. Sitting en banc in 1985, we held that the Reservation had not been diminished. Id. The Supreme Court denied certiorari on December 1, 1986. Ute Indian Tribe

v. Utah, 479 U.S. 994 (1986).

The State of Utah sought to relitigate the boundary issue in three criminal actions commenced in the Utah state courts. In these cases, the Utah Supreme Court concluded that the 1902-1905 allotment legislation had diminished the Uintah Valley Reservation. State v. Hagen, 858 P.2d 925 (Utah 1992); State v. Coando, 858 P.2d 926 (Utah 1992); State v. Perank, 858 P.2d 927 (Utah 1992).

In 1994, the Supreme Court granted certiorari "to resolve the direct conflict between these decisions of the Tenth Circuit and the Utah Supreme Court on the question whether the Uintah Reservation has been diminished." Hagen, 510 U.S. at 409. The Supreme Court expressly disagreed with our decision in Ute Indian Tribe and held that the Uintah Valley Reservation had been diminished. Id. at 421-22. In this appeal, we decide whether to modify our judgment in Ute Indian Tribe, after the time for rehearing has passed, in light of its conflict with a later, contrary decision of the Supreme Court.

## II.     UTE INDIAN TRIBE I-III: THE DISTRICT COURT, PANEL, AND EN BANC OPINIONS

In 1975, the Tribe sought to exercise jurisdiction over all of the land originally encompassed in the Uintah Valley Reservation pursuant to the Tribe's newly enacted Law and Order Code. When non-Indians living in and around several towns within the original boundaries protested the action, the Tribe sought declaratory and injunctive relief in federal court to establish the exterior

boundaries of the Uintah Valley Reservation and to restrain the state and local defendants from interfering with enforcement of the Law and Order Code within those boundaries. The Tribe argued that the original boundaries of the Uintah Valley Reservation, established by executive order in 1861 and confirmed by Congress in 1864, continued to exist undiminished. The Tribe thus argued that it had jurisdiction over all of the lands encompassed within the original boundaries of the Reservation because such lands were "Indian country" as defined by 18 U.S.C. § 1151.

On the other hand, the state and local defendants argued that congressional enactments from 1902 through 1905, opening Reservation lands to non-Indian settlement and setting aside lands for a national forest reserve, had the effect of diminishing the Uintah Valley Reservation. The defendants also argued that congressional enactments from 1894 to 1897 had the effect of completely disestablishing the Tribe's Uncompahgre Reservation.

In addressing the parties arguments, the district court gave a comprehensive summary of the relevant legislation, legislative history, contemporaneous interpretations by the executive branch, and other circumstances surrounding the enactment of the legislation. We therefore only briefly summarize the legislative treatment of the lands below.

**A.    Legislative Treatment of Reservation Lands**

### 1. The Uintah Valley Reservation

In 1902, Congress passed legislation directing the Secretary of the Interior to make individual allotments out of the Uintah Valley Reservation by October 1, 1903, provided that a majority of the adult male members of the Ute Indians consented. Act of May 27, 1902, ch. 888, 32 Stat. 263, 263-64 ("1902 Act"). The 1902 Act stated that after October 1, 1903, "all the unallotted lands within said reservation shall be restored to the public domain" and subject to entry by non-Indians under the homestead laws. Id. (emphasis added). Congress delayed the allotment process, however, and extended the opening date in 1903 and again in 1904. Act of Mar. 3, 1903, ch. 994, 32 Stat. 982, 997-98; Act of Apr. 21, 1904, ch. 1402, 33 Stat. 189, 207-08. In 1905, Congress extended the opening date a third time--to September 1, 1905--and directed the Secretary to allot the Reservation unilaterally if the Tribe's consent was not obtained. Act of Mar. 3, 1905, ch. 1479, 33 Stat. 1048, 1069-70 ("1905 Act"). The 1905 Act did not contain the same language restoring the unallotted and unreserved lands to the "public domain," but provided that such lands "shall be disposed of under the general provisions of the homestead and townsite laws of the United States." Id. (emphasis added).

2. **The National Forest Lands**

In addition to extending the time of entry under the 1902 Act and describing the entry process, the 1905 Act authorized the President to "set apart and reserve" lands in the Reservation as a forest reserve prior to opening. 33 Stat. 1070. Pursuant to this power, on July 14, 1905, President Theodore Roosevelt issued a proclamation designating some 1,010,000 acres within the Uintah Valley Reservation as an addition to the Uintah National Forest Reserve. Proclamation of July 14, 1905, 34 Stat. 3113, 3116. The proclamation also declared that the unallotted lands in the Uintah Valley Reservation, which were not otherwise reserved, would "be opened to entry, settlement and disposition under the general provisions of the homestead and townsite laws." Id. at 3120.

### 3. The Uncompahgre Reservation

In 1894, Congress passed legislation providing for the allotment of the Uncompahgre Reservation to individual members of the Tribe. The legislation stated that all unallotted lands "shall . . . be restored to the public domain and made subject to entry" under the homestead and mineral laws. Act of Aug. 15, 1894, ch. 290, 28 Stat. 286, 337-38 (emphasis added). The allotment process, however, was delayed, and in 1897, Congress passed legislation mandating the allotment of the Uncompahgre Reservation and opening the unallotted lands to entry. Act of June 7, 1897, ch. 3, 30 Stat. 62, 87.

### B. Ute Indian Tribe I: 1981 District Court Opinion

In 1981, the district court issued Ute Indian Tribe v. Utah, 521 F. Supp. 1072 (D. Utah 1981) (hereinafter "Ute Indian Tribe I"). The district court held that Congress's decision to open the unallotted lands to settlement did not diminish the Reservation's boundaries. Id. at 1132. The court recognized that the language of the 1902 Act directing that all unallotted lands "be restored to the public domain" would have diminished the Reservation had the unallotted lands then been opened for settlement. Id. at 1122. The court concluded, however, that the 1905 Act superseded the 1902 Act. Id. Unlike the 1902 Act, the 1905 Act provided only that the unallotted lands were to "be disposed of under" the homestead and township laws. Id. at 1132. The district court reasoned that the new language indicated that Congress did not intend to diminish the Reservation. Id. The district court therefore concluded that the unallotted lands remained part of the Uintah Valley Reservation. Id.

The district court reached a different conclusion on the status of the National Forest Lands and the Uncompahgre Reservation. Regarding the National Forest Lands, the court concluded that the language in the 1905 Act empowering the president to "set apart and reserve" timber lands for a national forest demonstrated Congress's clear intent to diminish the Uintah Valley Reservation. Id. at 1136. Likewise, the district court concluded that the language in the 1894

- 10 -

Act restoring unallotted reservation lands "to the public domain" showed a clear congressional intent to disestablish the Uncompahgre Reservation. Id. at 1106.

## C. Ute Indian Tribe II: The 1983 Court of Appeals Panel Decision

In a two-judge majority opinion, a panel of this court affirmed the district court opinion in part and reversed in part. Ute Indian Tribe v. Utah, 716 F.2d 1298 (10th Cir. 1983) (hereinafter "Ute Indian Tribe II"). The panel held that none of the lands in question remained within the original reservation boundaries.

The panel agreed with the district court that the 1902 Act's language restoring the unallotted lands "to the public domain" was sufficient to diminish the Uintah Valley Reservation. Id. at 1308-09. Unlike the district court, however, the panel concluded that the 1905 Act did not supersede Congress's intent to diminish the Reservation under the 1902 Act. Id. at 1311. Thus, the panel held that the 1902-1905 allotment legislation had diminished the Uintah Valley Reservation. Id. at 1311-12.

The panel agreed with the district court's conclusions regarding the National Forest Lands and the Uncompahgre Reservation. The panel concluded that Congress intended to withdraw the National Forest Lands, id. at 1314, and the Uncompahgre Reservation, id. at 1307, from their original reservation status.

- 11 -

**D.** **Ute Indian Tribe III:** **The 1985 Court of Appeals En Banc Decision**

On rehearing en banc, a majority of the court held that all of the lands at issue retained their reservation status. Ute Indian Tribe v. Utah, 773 F.2d 1087, 1093 (10th Cir. 1985) (en banc) (hereinafter "Ute Indian Tribe III"). The en banc court concluded that the 1902-1905 allotment legislation did not have the effect of diminishing or disestablishing the Uintah Valley Reservation. Id. at 1089. Similarly, the court held that the withdrawal of the National Forest Lands did not diminish the Uintah Valley Reservation, id. at 1090, and that the 1894 and 1897 allotment legislation did not disestablish the Uncompahgre Reservation. Id. at 1093.

In reaching a holding completely contrary to the panel, the en banc court relied on the newly-decided case of Solem v. Bartlett, 465 U.S. 463 (1984). The court concluded that under Solem, congressional language restoring reservation lands to the public domain "is not the same as a congressional state of mind to diminish," and hence "does not reliably establish the clear and unequivocal evidence of Congress' intent to change the boundaries." Ute Indian Tribe III, 773 F.2d at 1092. Further, the court found no legislative history or other contemporary historical evidence sufficient to support a finding of diminishment or disestablishment as to any of the lands in question. Id. at 1092-93. Thus, the court held that all the lands retained their reservation status and remained Indian

country, subject to the jurisdiction of the Tribe and the federal government. Thereafter, the Supreme Court denied certiorari. Ute Indian Tribe v. Utah, 479 U.S. 994 (1986).

### III.     UTAH V. HAGEN: THE 1994 SUPREME COURT DECISION

In several related criminal cases arising in the late 1980s, the Utah Supreme Court ruled, contrary to the Tenth Circuit, that the original boundaries of the Uintah Valley Reservation had been diminished by the 1902-1905 allotment legislation. See State v. Perank, 858 P.2d 927 (Utah 1992); State v. Coando, 858 P.2d 926 (Utah 1992); State v. Hagen, 858 P.2d 925 (Utah 1992). The cases arose as a result of state felony prosecutions against three Indians for crimes committed in Myton and Roosevelt, Utah, two towns within the original boundaries of the Uintah Valley Reservation. The defendants challenged the prosecutions on the basis that the state trial court lacked jurisdiction over their crimes because the defendants committed their crimes in "Indian country" as defined by 18 U.S.C. § 1151(a). The defendants argued that under our en banc decision in Ute Indian Tribe III, the towns remained within the Reservation and thus within Indian country. The State of Utah, on the other hand, argued that our holding in Ute Indian Tribe III was wrong, that the Reservation had been diminished, and that the towns were outside the Reservation and thus outside Indian country. The Utah Supreme Court agreed with the State, and held that because the Reservation

- 13 -

had been diminished, the state trial court properly exercised criminal jurisdiction over the defendants. Perank, 858 P.2d at 953; Coando, 858 P.2d at 927; Hagen, 858 P.2d 925-26.

In 1993, the Supreme Court granted certiorari in Hagen to resolve the conflict between the decisions of the Tenth Circuit and the Utah Supreme Court. Hagen v. Utah, 507 U.S. 1028 (1993). In 1994, the Supreme Court affirmed the Utah Supreme Court's resolution of the boundary issue, expressly rejecting Ute Indian Tribe III's conclusion that the Uintah Valley Reservation had not been diminished. Hagen v. Utah, 510 U.S. 399, 421-22 (1994).

In Hagen, the Supreme Court performed a familiar analysis of the statutory language, legislative history, and contemporary historical understanding of the allotment legislation at issue. See id. at 410-21. The Court's analysis, however, was limited to the status of the unallotted Uintah Valley Reservation lands opened to settlement under the 1902-1905 allotment legislation. See id. The Court did not address the National Forest Lands or the Uncompahgre Reservation, neither of which was before the Court for consideration. After looking to the three diminishment factors, the Court concluded that Congress's "baseline intent to diminish the Reservation expressed in the 1902 Act survived the passage of the 1905 Act," id. at 415, and that the "[c]ontemporary historical evidence supports [the] conclusion that Congress intended to diminish the Uintah Reservation." Id.

- 14 -

at 416. The Court therefore upheld the State of Utah's exercise of criminal jurisdiction over acts occurring within the original boundaries of the Uintah Valley Reservation. Id. at 421-22.

## IV.    Ute Indian Tribe IV: The 1996 District Court Decision

Immediately after the Utah Supreme Court issued its slip opinions in the state criminal cases, the Tribe filed a motion in federal district court seeking a permanent injunction preventing the state and local defendants from enforcing or relying upon Perank, Coando, and Hagen in any way. On August 31, 1992, the state and local defendants and the Tribe entered into a stipulation, under which the state and local defendants agreed to refrain from enforcing the Utah Supreme Court decision in Perank or exercising jurisdiction in any manner inconsistent with the en banc decision in Ute Indian Tribe III, pending a decision on the merits in the district court. The district court incorporated the stipulation into an order dated September 2, 1992 ("Injunction Order").

In 1993, after the Supreme Court granted certiorari in Hagen, the district court stayed further proceedings on the Tribe's motion pending the outcome of Hagen in the Supreme Court. On February 23, 1994, the Supreme Court issued its decision in Hagen. On April 24, 1994, the state and local defendants filed a motion to vacate and set aside the Injunction Order and to dismiss the Tribe's motion for permanent injunctive relief.

On May 2, 1994, the district court modified the Injunction Order "to allow the [s]tate and [l]ocal [d]efendants to prosecute felony crimes occurring on lands within the original boundaries of the Uintah Valley Reservation which are not 'Indian country' as defined by 18 U.S.C. § 1151, et seq." The court emphasized that it was "not determining one way or another which lands may or may not constitute 'Indian country.'"[1]

On April 2, 1996, the district court issued Ute Indian Tribe v. Utah, 935 F. Supp. 1473 (D. Utah 1996) ("Ute Indian Tribe IV"). In a comprehensive and detailed opinion, the district court fully addressed the binding effect, as between the parties, of our earlier en banc decision in Ute Indian Tribe III, as well as the extent of direct conflict between Ute Indian Tribe III and Hagen. Id. at 1484-1516. Rather than finally deciding these issues, however, the district court held that it was bound under "law of the case" rules to enforce the mandate in Ute Indian Tribe III. Id. at 1516-25. Thus, the district court did not reach the merits of the Tribe's request for permanent injunctive relief. Id. In lieu of a final resolution of the dispute, the district court requested that we issue instructions on how to proceed and suggested that we construe the request as an invitation to

---

[1] The district court modified its order to allow the State of Utah to prosecute felonies on former reservation lands because in United States v. Duncan, 857 F. Supp. 852 (D. Utah 1994), the district court had dismissed a federal felony prosecution against an Indian for acts occurring in Roosevelt, Utah. The court ruled that Hagen precluded federal jurisdiction on such lands. Id. at 853.

recall our mandate in Ute Indian Tribe III. The court also concluded that the Injunction Order, as modified, should remain in effect to allow the state and local defendants to prosecute criminal felonies occurring on former Uintah Valley Reservation lands. Id. at 1531. This appeal followed.

## DISCUSSION

### I. INTRODUCTION

On appeal, the Tribe maintains that principles of finality require the district court to enjoin permanently the state and local defendants from exercising jurisdiction in a manner inconsistent with Ute Indian Tribe III. On the other hand, the state and local defendants argue that we should give effect to the contrary boundary determination in Hagen by recalling the mandate in Ute Indian Tribe III in its entirety and reinstating the original Tenth Circuit panel opinion. The United States as amicus curiae urges us to recall and modify the mandate in Ute Indian Tribe III only to the extent that it directly conflicts with Hagen.

In resolving this dispute, we follow a three-part framework. First, we decide whether the district court was bound to follow the mandate in Ute Indian Tribe III by continuing the Injunction Order. After concluding that the district court properly followed our mandate, we nevertheless decide whether to modify Ute Indian Tribe III in light of the inconsistent boundary determination in Hagen. Finally, after concluding that Ute Indian Tribe III should be modified, we decide

whether to recall our mandate in its entirety or modify our en banc opinion only to the extent that it directly conflicts with Hagen. Because of the importance of finality, we conclude that Ute Indian Tribe III should be modified only to the extent that it conflicts with Hagen.

## II. THE BINDING EFFECT OF UTE INDIAN TRIBE III

We begin by determining the binding effect of Ute Indian Tribe III on the allocation of jurisdiction among the federal government, the Tribe, and the state and local defendants. Whether the district court was bound by the mandate in Ute Indian Tribe III to continue the Injunction Order, and whether this court is bound by principles of finality to enforce our prior boundary determination, are separate inquiries. We address each question in turn.

### A. The Mandate Rule

The state and local defendants first contend that the district court erred in holding that it was bound by Ute Indian Tribe III to continue to enjoin their exercise of civil and non-felony jurisdiction despite the Supreme Court's decision in Hagen. We review the district court's decision to continue an injunction for an abuse of discretion, examining "whether the district court committed an error of law or relied on clearly erroneous fact findings." Walmer v. United States Dep't of Defense, 52 F.3d 851, 854 (10th Cir.), cert. denied, 116 S. Ct. 474 (1995). We review questions of law decided by the district court de novo. Harolds Stores,

- 18 -

Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533, 1555 (10th Cir.), cert. denied, 117 S. Ct. 297 (1996).

The district court concluded that it was bound by the "law of the case" doctrine to enforce the boundary determinations in Ute Indian Tribe III.  Under that doctrine, once a court decides an issue, the same issue may not be relitigated in subsequent proceedings in the same case.  Arizona v. California, 460 U.S. 605, 618-19 (1983); United States v. Monsisvais, 946 F.2d 114, 115-16 (10th Cir. 1991).  An important corollary of the doctrine, known as the "mandate rule," provides that a district court "must comply strictly with the mandate rendered by the reviewing court."  Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America, 962 F.2d 1528, 1534 (10th Cir. 1992); see also Mason v. Texaco, Inc., 948 F.2d 1546, 1553 (10th Cir. 1991) ("Under the 'law of the case' doctrine, the district court may not deviate from the appellate court's mandate.").  In this case, the district court concluded that the mandate in Ute Indian Tribe III remained in effect and therefore ruled that it was bound to follow the mandate by continuing to enjoin the defendants' exercise of jurisdiction.

The state and local defendants contend that the district court is not bound by the mandate in Ute Indian Tribe III because of an intervening change in controlling law, an exception to the mandate rule.  See Pittsburg & Midway Coal Mining Co. v. Watchman, 52 F.3d 1531, 1536 n.4 (10th Cir. 1995).  The

defendants maintain that because <u>Hagen</u> was "intervening" (<u>i.e.</u>, coming after <u>Ute Indian Tribe III</u> but before the Tribe's present motion for injunctive relief), the district court should have departed from the appellate mandate and followed the boundary determination in <u>Hagen</u>. The defendants contend that the district court, by failing to do so, wrongfully continued to enjoin their exercise of jurisdiction pursuant to <u>Hagen</u>.

The argument of the state and local defendants is without merit. In short, the intervening-change-in-law exception does not apply where, as here, the case in which the erroneous ruling occurred is no longer sub judice--that is, where the case has become final. <u>See</u> <u>Colorado Interstate Gas</u>, 962 F.2d at 1534 (holding that once an appellate court resolves an issue and remands the case to enter judgment in accordance with the mandate, the district court may not disregard the mandate and apply a later change in law on remand because the question is no longer sub judice); <u>Collins v. City of Wichita</u>, 254 F.2d 837, 839 (10th Cir. 1958) (holding that "[a] change in the law or in the judicial view of an established rule of law is not such an extraordinary circumstance which justifies" setting aside a final judgment).

In <u>Ute Indian Tribe III</u>, our en banc opinion disposed of all boundary questions at issue on the merits. Our ruling left nothing for the district court to address beyond the "ministerial dictates of the mandate." <u>Colorado Interstate Gas</u>

Co., 962 F.2d at 1534. In other words, the case was no longer sub judice after December 9, 1986. As of that date, the district court was without authority to depart from an appellate mandate based on a later change in law. Because Ute Indian Tribe III proceeded to a final decision, a later change in law could not "reopen the door already closed." James B. Beam Distilling Co. v. Georgia, 501 U.S. 529, 541 (1991). Accordingly, we hold that the district court properly followed our mandate in Ute Indian Tribe III by continuing to enjoin the state and local defendants from exercising jurisdiction pursuant to Hagen.

**B.    Modification of Ute Indian Tribe III**

Although the district court did not err in holding that it was bound by Ute Indian Tribe III, we nevertheless must decide whether to modify our judgment in Ute Indian Tribe III in light of the Supreme Court's inconsistent boundary determination in Hagen. The question whether to modify our earlier judgment raises competing concerns involving the finality of a court's judgment and the need for uniformity in decisionmaking throughout the federal court system. In deciding this question, we first discuss whether an appellate court has the power to modify a mandate and the circumstances in which exercise of that power is appropriate. With these circumstances in mind, we next determine whether we are precluded by the principles of collateral estoppel or res judicata from departing from the boundary determination of Ute Indian Tribe III. Finally, after

concluding that we are not bound by the traditional principles of finality, we directly confront the relative importance of finality and uniformity in the context of this case.

### 1.    The Power of an Appellate Court to Modify a Mandate

The defendants' motion to recall the mandate in Ute Indian Tribe III requires us first to ask whether an appellate court possesses the authority to recall or modify a mandate after the time for rehearing has passed.  In this circuit, as in all circuits that have addressed the issue, "an appellate court has power to set aside at any time a mandate that was procured by fraud or act to prevent an injustice, or to preserve the integrity of the judicial process."  Coleman v. Turpen, 827 F.2d 667, 671 (10th Cir. 1987); see also American Iron & Steel Inst. v. EPA, 560 F.2d 589, 593 n.15 (3d Cir. 1977) (listing cases); Greater Boston Television Corp. v. FCC, 463 F.2d 268, 275-80 (D.C. Cir. 1971) (discussing particular grounds for recalling a mandate).  Although the rule is stated in broad terms, the appellate courts have emphasized that the power to recall or modify a mandate is limited and should be exercised only in extraordinary circumstances.  See American Iron & Steel Inst., 560 F.2d at 594 (emphasizing that recall of a mandate is "an extraordinary remedy, one to be used sparingly").[2]  The limited

_____

[2]  Indeed, we have found only one case in which we have departed from a prior mandate after a final decision because of a later change in law.  In Pierce v. Cook & Co., 518 F.2d 720, 723 (10th Cir. 1975), we permitted relitigation of already settled claims

nature of this power is a reflection of the importance of finality: once parties are afforded a full and fair opportunity to litigate, the controversy must come to an end and courts must be able to clear their dockets of decided cases. As the Third Circuit explained, "[P]arties should be afforded ample opportunity to litigate their claims, but once a final disposition is reached they should not expect that the good offices of the court will be available for a chance to press their claims anew." Id. at 592. Mindful of the important limitations on an appellate court's power to disrupt a settled judgment, we next address whether we are precluded from modifying the mandate in Ute Indian Tribe III under the principles of collateral estoppel or res judicata .

## 2. Collateral Estoppel and Res Judicata

In seeking permanent injunctive relief against the state and local defendants, the Tribe contends that collateral estoppel and res judicata preclude the state and local defendants from relying on Hagen. In particular, the Tribe argues that the Court should enjoin the defendants' enforcement of Hagen under the relitigation exception to the Anti-Injunction Act, 28 U.S.C. § 2283,[3] which

---

where plaintiffs with claims under state law were forced to litigate in federal court because of diversity and received "substantially different treatment than that [later] received in state court by another injured in the same accident." Id. at 723. Pierce was an "extraordinary case" based on an "unusual combination of events" and is not applicable to the case before us today. Id.

[3] Section 2283 provides: "A court of the United States may not grant an injunction to stay proceedings in a State Court except as expressly authorized by Act of Congress, or

permits a federal court to enjoin proceedings in state court where the party asserting a claim or issue in the state court is barred from doing so by res judicata or collateral estoppel. See Chick Kam Choo v. Exxon Corp., 486 U.S. 140, 150-51 (1988) ("The relitigation exception was designed to permit a federal court to prevent state litigation of an issue that previously was presented to and decided by the federal court. It is founded in the well-recognized concepts of res judicata and collateral estoppel."). The Tribe argues that because Ute Indian Tribe III produced a final judgment on the merits (thereby resolving the boundary issue in favor of the Tribe), the doctrine of collateral estoppel binds this court and precludes the defendants from enforcing the contrary holding in Hagen. The Tribe maintains that the Supreme Court's decision in Federated Department Stores, Inc. v. Moitie, 452 U.S. 394 (1981), prohibits any departure from the settled boundary determination of Ute Indian Tribe III, even where that decision is erroneous in light of a later change in law.

We disagree that Federated Department Stores controls the outcome of this case. In Federated Department Stores, 452 U.S. at 398, the Supreme Court rejected an attempt by the Ninth Circuit to craft an exception to the doctrine of res judicata based on a later change in controlling law. The case involved seven retail purchasers who brought separate actions against the owners of various

where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

- 24 -

department stores, alleging that the stores had engaged in illegal price fixing. Id. at 395-96. After the district court dismissed the actions on the grounds that the plaintiffs had failed to state a claim for relief under the applicable statute, five of the plaintiffs appealed the ruling and, ultimately, obtained a reversal by the Supreme Court. Id. at 396. Instead of appealing the district court's ruling as the other five plaintiffs had done, two plaintiffs refiled their actions in state court, which were removed to federal court. Id. The federal district court held that because the two plaintiffs sought to relitigate the same claim against the same defendants, the actions had to be dismissed under the doctrine of res judicata. Id. at 396-97.

The two plaintiffs appealed to the Ninth Circuit. Id. at 397. While their appeal was pending, the Supreme Court announced that the other plaintiffs had stated a claim for relief. Id. The Ninth Circuit concluded that the two plaintiffs should be allowed to benefit from the Supreme Court's decision because their position was closely interwoven with the other five cases. Id. The court stated that because all of the dismissals rested on precedent that the Supreme Court had since overruled, the doctrine of res judicata must give way to the competing concerns of "public policy" and "simple justice." Id. at 398.

In reversing, the Supreme Court expressly rejected the Ninth Circuit's "novel exception to the doctrine of res judicata." Id. The Court explained:

> [W]e do not see the grave injustice which would be done by the application of accepted principles of res judicata. . . . The doctrine of res judicata serves vital public interests beyond any individual judge's ad hoc determination of the equities of a particular case. There is simply no principle of law or equity which sanctions the rejection by a federal court of the salutary principle of res judicata . . . . This Court has long recognized that [p]ublic policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be considered forever settled as between the parties.

Id. at 401 (citations and internal quotation marks omitted).

Contrary to the Tribe's argument, our case is distinguishable from Federated Department Stores in two important respects. First, in contrast to Federated Department Stores, where the issue was whether a change in law would permit the incipient relitigation of an issue resolved in a prior suit, the State of Utah in this case has already relitigated the boundary issue. We are not now deciding whether a party--in this case the State--deserves a second bite at the apple. The boundary relitigation is over. The Utah Supreme Court has issued a final ruling, which the United States Supreme Court has affirmed, resulting in a clearly inconsistent judgment. For this reason, the Tribe's reliance on collateral estoppel is misplaced.

Second, in deciding whether to modify Ute Indian Tribe III, we are not motivated by a desire to achieve a more accurate judgment or to avoid the injustice that might result from a strict application of the principles of finality, as was the case in Federated Department Stores. The fact that Ute Indian Tribe III

may have been wrongly decided or operates unfairly against the state and local defendants is not a concern that informs our analysis. See 18 CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 4426, at 265 (1981) ("If relitigation were permitted whenever it might result in a more accurate determination, in the name of 'justice,' the very values served by preclusion would be quickly destroyed."). Rather, our decision is based on the need to reconcile two inconsistent boundary determinations and to provide a uniform allocation of jurisdiction among separate sovereigns. For this reason, Federated Department Store's relevance to this case is limited. The question here is not whether the State of Utah should be able to relitigate the boundary issue (which it has already done), but which decision--Ute Indian Tribe III or Hagen--should control the allocation of jurisdiction among the state and local defendants, the Tribe, and the federal government. The State's successful relitigation of the boundary issue has put the judgment in Ute Indian Tribe III on a collision course with Hagen, and therefore, we must directly confront whether Ute Indian Tribe III should give way to the equally final, contrary judgment in Hagen. To that inquiry, we now turn.

### 3. Finality and Uniformity

As discussed above, the question whether to modify our judgment in Ute Indian Tribe III raises the competing concerns of finality and uniformity. Thus,

in deciding this question, we must assess the relative importance of finality and uniformity in the context of this case.

Although we are not bound by collateral estoppel to enforce the boundary determination of Ute Indian Tribe III, departure from this settled judgment implicates the important purposes of finality. Over a century ago, the Supreme Court discussed the importance of finality:

> This general rule is demanded by the very object for which civil courts have been established, which is to secure the peace and repose of society by the settlement of matters capable of judicial determination. Its enforcement is essential to the maintenance of social order; for the aid of judicial tribunals would not be invoked for the vindication of rights of person and property if, as between parties and their privies, conclusiveness did not attend the judgments of such tribunals in respect of all matters properly put in issue, and actually determined by them.

Southern Pac. Ry. Co. v. United States, 168 U.S. 1, 49 (1897); see also Kremer v. Chem. Constr. Corp., 456 U.S. 461, 467 n.6 (1982). The Court also has addressed the particular purposes of finality:

> To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.

Montana v. United States, 440 U.S. 147, 153-54 (1979). Accordingly, before departing from a settled decision, we must consider whether such departure might "substantially frustrate [collateral estoppel's] purpose of protecting litigants from

- 28 -

burdensome relitigation and of promoting judicial economy." United States v. Stauffer Chem. Co., 464 U.S. 165, 172 (1984).

The Tribe contends that departure from Ute Indian Tribe III would frustrate the important purposes of finality and would upset its reasonable expectations in the continuing validity of a settled judgment. The litigation that led to Ute Indian Tribe III lasted ten years and resulted in a costly victory for the Tribe. It also consumed important judicial resources. Perhaps most important from the Tribe's point of view, the decision in Ute Indian Tribe III purported to define conclusively the respective jurisdictional boundaries of the various governmental authorities operating in and around the Uintah Valley Reservation. Indeed, the Tribe continues to rely on Ute Indian Tribe III in exercising civil and non-felony jurisdiction on lands within the original reservation boundaries. "When a court has determined disestablishment of a given reservation in its particular historical and factual setting, prevention of inconsistent adjudication becomes desirable insofar as it fosters reliance on judicial decision making." White Earth Band of Chippewa Indians v. Alexander, 683 F.2d 1129, 1135 (8th Cir. 1982). The Tribe argues that this reasoning, as well as the other important purposes of finality, support enforcement of the settled judgment of Ute Indian Tribe III.

The same important purposes of finality, however, apply equally to the final judgment in Hagen. Once Hagen became final, the State of Utah was entitled to

- 29 -

rely on the collateral estoppel effect of that judgment just as the Tribe was entitled to rely on its judgment in Ute Indian Tribe III. Had the Tribe brought its present request for injunctive relief prior to the conclusion of the state litigation in Hagen, the principle of finality clearly would have favored the Tribe and might even have required an injunction against the state proceedings. See Parsons Steel, Inc. v. First Ala. Bank, 474 U.S. 518, 524 (1986) (holding that the relitigation exception to the Anti-Injunction Act does not permit a federal court to enjoin a state court proceeding "once the state court has finally rejected a claim of res judicata"). In this situation, however, where the State has already relitigated the boundary issue, the economy and judicial resource concerns that normally operate to preclude a second lawsuit are of little relevance. Although the Tribe may have a more forceful reliance interest given the length of time Ute Indian Tribe III has remained in effect, enjoining the state and local defendants in this situation would do little to further the core purposes of finality. As discussed above, the second litigation has proceeded to a final judgment and has already resulted in an inconsistent decision.

Moreover, we note that "res judicata and collateral estoppel . . . promote the comity between state and federal courts that has been recognized as a bulwark of the federal system." Allen v. McCurry, 449 U.S. 90, 95-96 (1980). Thus, enjoining the State's enforcement of Hagen in this situation would "violate basic

tenets of comity and federalism." Kremer, 456 U.S. at 478. By reaching the merits in Hagen, the Utah Supreme Court effectively ruled that the State was not precluded from relitigating the boundary issue. In the absence of a successful challenge to this ruling in the Supreme Court, we must give full effect to the state court judgment and may not impose "the highly intrusive remedy of a federal-court injunction against the enforcement of the state court judgment." Parsons Steel, Inc., 474 U.S. at 525.[4]

In the situation before us, where the purposes of finality do not clearly support enforcement of either judgment, we might on the sole basis of our hierarchical system of courts prefer to give effect to the pronouncement of the Supreme Court. In an analogous context, for example, the D.C. Circuit stated that "[w]here, as here, a decision of the Supreme Court--the preeminent tribunal in our

---

[4] In State v. Hagen, 802 P.2d 745, 747 (Utah Ct. App. 1990), the Utah Court of Appeals expressly relied on the collateral estoppel effect of Ute Indian Tribe III in holding that the state court lacked jurisdiction over the Indian defendants. Nevertheless, the Utah Supreme Court reversed, citing its earlier conclusion in the companion case of State v. Perank, 858 P.2d 927 (Utah 1992), but without further discussion of collateral estoppel. Hagen, 858 P.2d at 925-26. When Hagen reached the Supreme Court, the Court declined to address whether collateral estoppel barred relitigation of the boundary issue. Hagen, 510 U.S. at 409-10. The Court relied on the procedural ground that counsel for the petitioner had failed to raise collateral estoppel in seeking a writ of certiorari. Id. The Court found "no reason to consider an argument that petitioner not only failed to raise but on which he expressly refused to rely in seeking a writ of certiorari." Id. at 410. Accordingly, the Utah Supreme Court's ruling that collateral estoppel did not prevent relitigation of the boundary issue remains the settled judgment of that court.

judicial system--departs in some pivotal aspects from those of lower federal courts, amendatory action may be in order to bring the pronouncements of the latter courts into line with the views of the former." American Iron & Steel Inst., 560 F.2d at 596. We do not, however, take such "amendatory action" in this case merely on the basis of the incongruency between our decision in Ute Indian Tribe III and Hagen. Additional factors, including the importance of uniformity, also support our view that Ute Indian Tribe III should be modified in light of Hagen.

Uniformity is an important value in our system of judicial decisionmaking. While "[c]onflicts in the circuits are generally accepted and in some ways even welcomed," Stauffer Chem. Co., 464 U.S. at 177 (White, J., concurring), uniform decisionmaking within each circuit is essential. The related doctrines of collateral estoppel and stare decisis are exactly the sort of tools that have been designed to ensure uniformity and compliance with binding precedent. Like collateral estoppel, stare decisis "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." Payne v. Tennessee, 501 U.S. 808, 827 (1991). Unfortunately, these doctrines have so far failed to prevent the inconsistency between Ute Indian Tribe III and Hagen. Given the important values that underlie these doctrines, we cannot allow such an inconsistency to persist.

More importantly, the lack of uniformity between <u>Ute Indian Tribe III</u> and <u>Hagen</u> presents a practical dilemma of daily importance. Although the Tribe continues to exercise civil and non-felony criminal jurisdiction on those portions of the Uintah Valley Reservation that were opened to settlement under the 1902-1905 allotment legislation, the State of Utah is solely responsible under <u>Hagen</u> for bringing felony prosecutions on the same lands. Often the difference between state and tribal jurisdiction is a matter of only a few dollars, the amount separating a misdemeanor from a felony in the case of theft, for example. Similar problems arise in determining whether an assault constitutes a misdemeanor subject to tribal and federal jurisdiction or whether it constitutes a felony subject to state jurisdiction. In this situation, the interest of uniformity clearly supports modification of <u>Ute Indian Tribe III</u> and creation of a uniform allocation of jurisdiction. As the Third Circuit stated, "'[U]niformity' in application of principles and in decision-making might constitute a 'special reason for disturbing [the] repose and finality . . . ' of an earlier adjudication." <u>American Iron & Steel Inst.</u>, 560 F.2d at 597 (quoting <u>Greater Boston Television Corp.</u>, 463 F.2d at 278-79).

Although a uniform allocation of jurisdiction would eliminate the existing confusion, we are mindful that "[f]inality must . . . delimit equality in a temporal sense, and we must accept as a fact that the argument for uniformity loses force

- 33 -

over time." James B. Beam Distilling Co., 501 U.S. at 542.  As a limit on uniformity, finality is of particular importance where a change in law threatens to disrupt a final tort award or other settled judgment based on then-existing legal principles. The need for finality, however, applies with less force to judgments that are not "inherently final" but are rather of "a continuing nature." American Iron & Steel Inst., 560 F.2d at 599.  Where a prior erroneous judgment necessarily affects continuing conduct, the interests of uniformity may demand departure from the prior judgment to bring a court's view of the law into line with the prevailing view.  See Federal Labor Relations Auth. v. United States Dep't of Treasury, 884 F.2d 1446, 1456 (D.C. Cir. 1989) (concerning federal agencies' duty to disclose federal employees' names and addresses to labor unions); American Iron and Steel, 560 F.2d at 597-99 (concerning application of water pollution regulations); Moch v. East Baton Rouge Parish School, 548 F.2d 594 (5th Cir. 1977) (concerning apportionment of parish school board); Christian v. Jemison, 303 F.2d 52, 54-55 (1962) (concerning prohibition of racial segregation after abandonment of "separate but equal" doctrine); 18 WRIGHT ET AL., § 4415, at 131 (stating that "ordinary . . . preclusion rules are often strained by continuing conduct").  The character of Ute Indian Tribe III reflects this type of judgment. As the district court noted, the state and local defendants are not seeking "to unravel the intricate tapestry of individual judgments already made final each

time a new decision is announced." Ute Indian Tribe IV, 935 F. Supp. at 1510. Instead, the defendants are seeking to apply Hagen prospectively to the continuing conduct of separate sovereigns and the individuals living in and around the Uintah Valley Reservation. This case does not involve the retroactive application of Hagen to events or lawsuits that have occurred in the past. To the extent that Hagen threatens to displace a judgment "on which reliance may reasonably have been placed," James B. Beam Distilling Co., 501 U.S. at 538, today's decision is limited to prospective application only. See United States v. Cuch, 79 F.3d 987, 995 (10th Cir.) (rejecting the retroactive application of Hagen to vacate a federal criminal conviction on collateral attack), cert. denied, 117 S. Ct. 384 (1996).

The Tribe raises one final argument against modification of Ute Indian Tribe III. The Tribe contends that even if Ute Indian Tribe III does not continue to define the current boundaries of the Uintah Valley Reservation as between the State of Utah and criminal defendants under Hagen, the decision still should apply to legal relations between the state and local defendants and the Tribe. In effect, the Tribe urges us to adopt a dual jurisdictional system. Under such a system, Ute Indian Tribe III would control the allocation of authority among the named parties to this lawsuit in their dealings with each other, while Hagen would apply to the state and local defendants' relationships with all other parties. The Tribe contends that such a dual system is warranted because the state and local

- 35 -

defendants, as full participants in Ute Indian Tribe III, are directly bound by our en banc decision, while the Tribe, as a nonparty to the litigation in Hagen, is not directly bound by the Supreme Court's decision.  Accordingly, the Tribe contends that the state and local defendants may properly assert jurisdiction over non-Indians within those portions of the original Uintah Valley Reservation that were open to settlement under the 1902-1905 legislation (the Hagen-based jurisdictional overlay).  In their dealings with the Tribe and its members, however, the state and local defendants must recognize the authority of the Tribe and the federal government within those same portions of the Reservation (the Ute Indian Tribe III-based overlay).

We reject the Tribe's contention that jurisdiction must be allocated among the parties by two inconsistent boundary determinations.  The task of allocating jurisdiction necessarily involves line-drawing, and in an area where there is a compelling need for uniformity, there must be a single bright line.  A dual system would only continue the confusion that has characterized the relationship between the parties since the issuance of Hagen.  Under the Tribe's approach, for example, jurisdiction would depend not on the geographic locale of the crime or event at issue, but on the relationship between the State of Utah and the individual or entity over whom the State seeks to exercise jurisdiction.  Rather than creating a stable allocation of jurisdiction where the parties' respective jurisdictions can be

determined by reference to lines on a map, the Tribe's approach would introduce enormous uncertainty into an already complicated system. Each time the state and local defendants attempt to assert jurisdiction over a new party, whether to collect a tax or enforce a regulation, they would risk having to establish jurisdiction over that party through time-consuming and costly litigation. In addition, we question the propriety of allocating jurisdiction based on the application of procedural rules (i.e., collateral estoppel and stare decisis) that were themselves designed to eliminate inconsistency and unpredictability. Further, the legal basis for the Tribe's dual jurisdictional scheme is undermined by our conclusion that the state and local defendants are not directly bound by Ute Indian Tribe III, at least as that decision conflicts with the contrary holding in Hagen.

For the reasons articulated above, we conclude that modification of our earlier judgment is appropriate, not merely because the two decisions are incongruent, but because of the effect of the incongruency on the interests of uniformity and the integrity of our system of judicial decisionmaking. We therefore hold that the judgment in Ute Indian Tribe III should be modified in light of the extraordinary circumstances presented in this case. To dispel any doubts, we emphasize the rarity that should attend the use of this remedy. "Because this Court ordinarily will view motions to recall a mandate with disfavor, the opinion in this matter should not be read as an invitation to litigants

to seek review of already adjudicated claims." <u>American Iron & Steel Inst.</u>, 560 F.2d at 599.

We do not, however, recall <u>Ute Indian Tribe III</u> in its entirety. To the extent that <u>Ute Indian Tribe III</u> decided matters not addressed in <u>Hagen</u>, finality requires those decisions to remain undisturbed. Thus, we modify our earlier judgment only to the extent that it directly conflicts with the holding in <u>Hagen</u>. We next address the extent to which the two cases are in direct conflict.

## III.   JURISDICTIONAL BOUNDARIES AFTER <u>HAGEN</u>

In determining the parties' respective jurisdictional boundaries after <u>Hagen</u>, we begin by identifying the areas where <u>Ute Indian Tribe III</u> and <u>Hagen</u> are not in conflict and can be reconciled. To the extent that the boundary determinations made in <u>Ute Indian Tribe III</u> do not directly conflict with <u>Hagen</u>, they remain in effect.

In <u>Ute Indian Tribe IV</u>, the 1996 district court opinion, the court fully addressed the areas of genuine conflict between <u>Ute Indian Tribe III</u> and <u>Hagen</u>. In large part, we need look no further than the district court's detailed opinion to determine those portions of the original Uintah Valley Reservation that remain the exclusive province of the Tribe and the federal government. <u>See Ute Indian Tribe IV</u>, 935 F. Supp. at 1485-1505. In sum, we agree with the district court that <u>Hagen</u> did not effectively overrule the entire judgment in <u>Ute Indian Tribe III</u>,

including our holdings concerning the National Forest Lands and the Uncompahgre Reservation. Further, we agree that Hagen's only effect was to reduce (and not terminate) the boundaries of the Uintah Valley Reservation to the extent that lands within the Reservation were unallotted, opened for settlement under the 1902-1905 legislation, and not thereafter returned to tribal ownership. Accordingly, we hold that our prior judgment in Ute Indian Tribe III should be, and is now, modified to the extent that lands within the original reservation boundaries were unallotted, opened to non-Indian settlement under the 1902-1905 legislation, and not thereafter returned to tribal ownership.[5]

### A. The Uintah Valley Reservation, The Uncompahgre Reservation, and the National Forest Lands

In Ute Indian Tribe III, we decided three reservation diminishment issues. First, we concluded that the 1902-1905 allotment legislation did not have the effect of diminishing or disestablishing the Uintah Valley Reservation. Ute Indian Tribe III, 773 F.2d at 1989. Second, we concluded that the withdrawal of the National Forest Lands did not diminish the Uintah Valley Reservation. Id. at 1090. Finally, we held that the 1894 and 1897 allotment legislation did not diminish or disestablish the Uncompahgre Reservation. Id. at 1093.

---

[5] Because we depart from a mandate of the en banc court and modify the earlier judgment in this case, we have circulated this opinion to the en banc court pursuant to our rules. Each member of the en banc court has concurred in our holding.

Hagen dealt only with the first of these three issues. As the district court

stated:

> Hagen determined "that the Uintah Indian Reservation has been
> diminished by Congress," i.e., that the original boundary of the
> Uintah Valley Reservation does not currently define the present
> territorial extent of federal, state and tribal jurisdiction in the Uintah
> Basin.

Ute Indian Tribe IV, 935 F. Supp. at 1484 (citing Hagen, 510 U.S. at 419-21).

The district court continued:

> Hagen [did not] address the Tenth Circuit's determination in [Ute
> Indian Tribe III] that the 1905 national forest withdrawals of
> approximately 1,010,000 acres of reservation land did not diminish
> the Uintah Reservation boundaries. Hagen also makes no ruling
> concerning the boundaries of the Uncompahgre Reservation, the
> original extent of which was reaffirmed by the Tenth Circuit.

Id. at 1485.

Although the state and local defendants admit that Hagen did not address

the status of the Uncompahgre Reservation or the National Forest Lands, they

assert that we should nevertheless recall our entire mandate in Ute Indian Tribe

III. The defendants argue that Hagen effectively overruled the fundamental

premise upon which the entire holding of Ute Indian Tribe III was based--namely,

that statutory restoration language is insufficient to infer diminishment. They

point out that in Hagen the Supreme Court stated that "restoration of unallotted

reservation lands to the public domain evidences a congressional intent with

respect to those lands inconsistent with the continuation of reservation status."

510 U.S. at 414. The state and local defendants argue that in light of this statement, Ute Indian Tribe III's holding concerning the National Forest Lands and the Uncompahgre Reservation cannot stand because the entire holding was based on a misreading of the same congressional restoration language that was at issue in Hagen.

Assuming that Ute Indian Tribe III's holding with respect to the National Forest Lands and the Uncompahgre Reservation was based on a misreading of the applicable legislation, such a misreading alone is not sufficient to justify departing from our earlier judgment. As we stated earlier, our decision to modify Ute Indian Tribe III does not result from the desire to correct a prior erroneous judgment, but rather from the need to reconcile our decision with a directly conflicting decision of the Supreme Court. Because Hagen did not directly address our holding in Ute Indian Tribe III as it relates to the National Forest Lands and the Uncompahgre Reservation, we have no reason to depart from that part of our prior judgment. We thus reject the defendants' contention that the judgment in Ute Indian Tribe III should be recalled in its entirety.

**B.      Non-Trust Lands Within the Original Boundaries of the Uintah Valley Reservation**

Because we have concluded that Hagen did not address the status of the National Forest Lands or the Uncompahgre Reservation, we must now address the extent to which Hagen directly conflicts with Ute Indian Tribe III. In particular,

- 41 -

we must decide which lands within the Uintah Valley Reservation are no longer Indian country after Hagen. The remaining controversy centers on whether the state and local defendants or the Tribe and the federal government have jurisdiction over the various categories of non-trust (i.e., fee), lands within the original boundaries of the Uintah Valley Reservation, whether held by Indians or non-Indians.

Under 18 U.S.C. § 1151, the Tribe and the federal government have civil and criminal jurisdiction over "Indian country." Pittsburg & Midway Coal Mining Co. v. Watchman, 52 F.3d 1531, 1540-41 (10th Cir. 1995). Indian country includes "all Indian allotments, the Indian titles to which have not been extinguished." 18 U.S.C. § 1151(c). This category constitutes lands held in trust by the federal government. Indian country also encompasses "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation." 18 U.S.C. § 1151(a). Thus, Indian Country also includes all non-trust, or fee, lands so long as such lands are located within the "limits of any Indian reservation."

There are four categories of non-trust lands at issue in this case:

(a) lands that passed from trust to fee status pursuant to non-Indian settlement under the 1902-1905 allotment legislation;

- 42 -

(b) lands apportioned to the "Mixed Blood" Utes under the Ute Partition Act, Act of Aug. 27, 1954, Pub. L. No. 97-698, ch. 1009, 68 Stat. 868 (codified at 25 U.S.C. §§ 677-677aa);

(c) lands allotted to individual Indians that have passed into fee status after 1905; and

(d) lands that were held in trust after the Reservation was opened in 1905 but that since have been exchanged into fee status by the Tribe for then-fee (now trust) lands in an effort to consolidate its land holdings pursuant to the Indian Reorganization Act, Act of June 18, 1934, ch. 576, 48 Stat. 984 (codified at 25 U.S.C. §§ 461-79) and the Indian Land Consolidation Act of 1983, Pub. L. No. 97-459, 96 Stat. 2517 (codified at 25 U.S.C. §§ 2201-11).

See Ute Indian Tribe IV, 935 F. Supp. at 1484, 1486. In Ute Indian Tribe III, we held that the 1902-1905 allotment legislation did not have the effect of diminishing or disestablishing the Uintah Valley Reservation. We thus concluded that all of the non-trust lands identified above remained "Indian country" under § 1151(a) as lands within "the limits of any Indian reservation." In this case, we must determine the extent to which Hagen directly conflicts with our earlier conclusion that all of the above categories of non-trust lands remain within Indian country.

The parties do not dispute that Hagen directly conflicts with the first category of non-trust lands, those lands passing in fee to non-Indians pursuant to the 1902-1905 allotment legislation. This was precisely the category of fee lands at issue in Hagen. Accordingly, we modify our mandate in Ute Indian Tribe III and hold in accordance with Hagen that these lands are no longer within Indian

country under section 1151(a) subject to the jurisdiction of the Tribe and the federal government.

With respect to the other three categories of non-trust lands, the state and local defendants argue that these lands also are no longer within Indian country after Hagen. They contend that the Supreme Court in Hagen "clearly contemplated that the exterior boundaries of the Reservation would simply be gone." Appt. Brief, at 44. In other words, the defendants argue that the Court held that the 1902-1905 legislation completely terminated the Reservation such that no discrete, definable reservation boundaries now exist. Under the defendants' theory, there are no external boundaries and thus no "limits of any reservation." Indian country therefore is confined under § 1151(c) to "Indian allotments . . . which have not been extinguished," or trust lands. Under the theory that Indian country is limited to trust lands, the defendants argue that the three disputed categories of non-trust lands no longer constitute Indian country.

We reject the defendants' argument that Hagen removed all non-trust lands within the original Uintah Valley Reservation from Indian country. In Hagen, the Supreme Court did not decide that the 1902-1905 allotment legislation completely disestablished the Uintah Valley Reservation, erasing its outer boundaries and rendering § 1151(a) inapplicable to the three disputed categories of non-trust lands. The Court in Hagen stated:

- 44 -

> [W]e hold that the restoration of <u>unallotted reservation lands</u> to the public domain evidences a congressional intent <u>with respect to those lands</u> inconsistent with the continuation of reservation status. Thus, the existence of such language in the operative section of a surplus land Act indicates that the Act <u>diminished</u> the reservation.

<u>Hagen</u>, 510 U.S. at 414 (emphasis added). The Court stated that the Uintah Valley Reservation had been "diminished" -- not "disestablished," "eliminated," or "terminated." Moreover, the diminishment was only "with respect to those lands" that had been restored to the public domain under the 1902-1905 legislation. See <u>Ute Indian Tribe IV</u>, 935 F. Supp. at 1487-88. We therefore conclude that <u>Hagen</u> did not erase the boundaries of the Uintah Valley Reservation and that the current "limits of [the] reservation" thus embrace the three categories of non-trust lands at issue. In sum, <u>Hagen</u> does not conflict with our holding in <u>Ute Indian Tribe III</u> that these categories of non-trust lands remain within Indian country under section 1151(a).

We note that this conclusion has the benefit of producing a stable, unchanging allocation of jurisdiction. Under our approach, the Tribe and the federal government retain jurisdiction over all trust lands, the National Forest Lands, the Uncompahgre Reservation, and the three categories of non-trust lands that remain within the boundaries of the Uintah Valley Reservation. The state and local defendants have jurisdiction over the fee lands removed from the Reservation under the 1902-1905 allotment legislation. Although a title search

may be necessary to determine which lands were opened under the 1902-1905 legislation, the parties' respective jurisdictions will never change once the status of those lands is conclusively determined.  By contrast, under the defendants' theory (i.e., that Indian country is limited to trust lands) the Indian country status of land would change as trust lands are transferred into fee lands.  We recognize that while our approach might result in a checkerboard allocation of jurisdiction, such a result is more desirable than the defendants' approach, which would produce a "moving checkerboard" because lands leaving trust status would also lose their status as Indian country.

In conclusion, we reject the argument that Indian country is confined to lands held in trust by the federal government under § 1151(c).  Rather, Indian country extends to all trust lands, the National Forest Lands, the Uncompahgre Reservation, and the three disputed categories of non-trust lands discussed above.[6]

## CONCLUSION

For the foregoing reasons, we DENY the defendants' motion to recall our mandate in Ute Indian Tribe III, 773 F.2d 1087 (10th Cir. 1985) (en banc), cert.

---

[6]  We decline to address whether any portion of the non-trust lands opened in 1905 might still constitute Indian country under section 1151(b) as a "dependent Indian community" because that question is not properly before the court.  The district court may be asked to consider the question upon remand.

denied, 479 U.S. 994 (1986).  Rather, we MODIFY our mandate in Ute Indian

Tribe III as set out above and REMAND with instruction that the district court

consider the Tribe's request for permanent injunctive relief in light of this

opinion.