**PUBLISH**
**FOR THE TENTH CIRCUIT**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 4, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

ADLYNN K. HARTE; ROBERT W.
HARTE; J.H., a minor, by and through his
parents and next friends, Adlynn K. Harte
and Robert W. Harte; L.H., a minor, by and
through her parents and next friends,
Adlynn K. Harte and Robert W. Harte,

      Plaintiffs - Appellants,

v.

THE BOARD OF COMMISSIONERS OF
THE COUNTY OF JOHNSON, KANSAS;
FRANK DENNING; MARK BURNS;
EDWARD BLAKE; MICHAEL
PFANNENSTIEL; JAMES COSSAIRT;
LARRY SHOOP; LUCKY SMITH;
CHRISTOPHER FARKES; THOMAS
REDDIN; TYSON KILBEY; LAURA
VRABAC,

      Defendants - Appellees,

No. 18-3091

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:13-CV-02586-JWL)**
_____

R. Allan Pixton, Kirkland & Ellis LLP, Chicago, Illinois (Cheryl A. Pilate, Morgan Pilate
LLC, Kansas City, Missouri, Mark J. Nomellini, Kirkland & Ellis LLP, Chicago, Illinois,
and Subash S. Iyer, Kirkland & Ellis LLP, Washington D.C., with him on the briefs), for
Plaintiffs - Appellants.

J. Lawson Hester, Pettis, Barfield & Hester, P.A., Jackson, Mississippi (Lawrence L. Ferree, III, Kirk T. Ridgway, and Brett T. Runyan, Ferree, Bunn, Rundberg & Ridgway, Chtd., Overland Park, Kansas, with him on the brief), for Defendants - Appellees.

_____

Before **LUCERO**, **HARTZ**, and **CARSON**, Circuit Judges.

_____

**CARSON**, Circuit Judge.

_____

Although we strive to ensure that the parties, the district courts, and the public understand our decisions, sometimes we falter. Plaintiffs previously appealed the district court's rulings on summary judgment and qualified immunity. We affirmed in part, reversed in part, and remanded. That sounds straightforward enough. But no judge on the prior panel could agree on a common disposition. As a result, we issued a one-paragraph per curiam opinion followed by three separate opinions. The district court, Plaintiffs, and Defendants all interpreted our per curiam opinion differently.

Today we must decide, among other things, how to proceed where two of the three panel judges share some common rationale, yet ultimately reach different outcomes, and a different combination of two judges reach a common outcome by using different rationales. Such a situation is rare. Specifically, in this case, Plaintiffs allege that probable cause dissipated during the search of their home. One judge on the prior panel held that Plaintiffs abandoned the issue on appeal. Two judges agreed that probable cause dissipated, but one of those two judges voted to grant qualified immunity because he believed the law was not clearly established. Thus, we are left with a panel opinion where two judges employed common

2

reasoning to conclude probable cause dissipated, but a different combination of two judges believed Defendants were entitled to summary judgment on that issue, albeit for different reasons. Which is our holding that the district court must follow: allow the dissipation claim to proceed based on the common reasoning or dismiss the dissipation claim based on the common result? For the reasons that follow, we hold that, in applying a fractured panel's holding, the district court need only look to and adopt the *result* the panel reached. To hold otherwise would be to go against the result expressed by two of the three panel members. That we cannot do. Accordingly, we exercise jurisdiction pursuant to 28 U.S.C. § 1291, affirm in part, reverse in part, and remand for further proceedings.

I.

After working many years in a United States intelligence agency in Washington D.C., Plaintiffs Adlynn Harte ("Addie") and Robert Harte ("Bob") sought a quiet, family-oriented neighborhood in which to raise their two children. Ultimately, they decided on Leawood, Kansas—a suburb of Kansas City. Bob, a stay-at-home father, began growing an indoor vegetable garden with his son, L.H., as part of an educational project. This fateful decision—along with Addie's enjoyment of loose-leaf tea—led to Johnson County, Kansas law enforcement officers surprising Plaintiffs with a SWAT-style raid on their suburban home just before 7:30 a.m. on April 20, 2012. Armed with a battering ram, firearms, and a disputed warrant, Johnson County Sheriff's Deputies detained Plaintiffs for over two hours while they searched Plaintiffs' residence from stem to stern. Before turning to Plaintiffs' claims

3

against Defendants, we explain how this suburban family with no criminal record other than a traffic ticket became embroiled in a marijuana raid.

On August 9, 2011, Bob and his children went shopping at Green Circle Garden Center. While sitting in his police cruiser in the parking lot, Missouri Highway Patrol officer Jim Wingo observed Bob leave the store with a small bag. This was no accident. Trooper Wingo was spending three to four hours per day watching this garden store. He kept meticulous notes on the store's customers, noting their sexes, ages, vehicle descriptions, license plate numbers, and what they had purchased. Wingo never saw Mr. Harte at the store again.

The previous April, Wingo initiated "Operation Constant Gardener" to round up people he had seen visiting local hydroponic gardening stores. He partnered with local law enforcement agencies that investigated the individuals on his list. Sergeant Tom Reddin of the Johnson County Sheriff's Office contacted Wingo about conducting a similar operation on April 20, 2012. Wingo informed Reddin that he did not gather enough information to justify a full throttle April 20 operation. Nevertheless, Reddin wanted to "at least mak[e] a day of it." Wingo sent Reddin a list of car license plates he had seen in the garden store parking lot and the names of their registered owners. Bob's name was on the list.

Reddin then ordered his deputies to investigate the Hartes. The deputies did not look into the Hartes' backgrounds. Rather, they merely collected and searched the Hartes' trash on three different occasions. During the first search on April 3, 2012, Deputies Edward Blake and Mark Burns found a small amount of wet, green

4

vegetation dispersed throughout the trash. They did not find it suspicious, however, and declined to photograph it. One week later, on April 10, Deputy Burns again searched the Hartes' garbage. He again found green vegetation, which he thought looked like "wet marijuana plant material." In his notes, he mentioned that he had found "[a] similar quantity of plant material of the same nature" in the Hartes' trash a week earlier, but also stated that he had disregarded it because "it was found among other innocent plant material and was misidentified." Again, Deputy Burns declined to take photographs of the wet plant material. His field-test of the substance, though, was positive for tetrahydrocannabinol ("THC"), which is one of the main chemical compounds found in marijuana. Finally, on April 17, Deputies Burns and Blake searched for the third and final time. They found more green vegetation, which again tested positive for THC. The deputies did not photograph any of the substances, nor did they send them to a crime lab for testing.

Unknown to the deputies, Addie enjoyed loose-leaf tea. If the deputies would have sent the wet vegetation to a crime lab for testing, they would have discovered that the wet vegetation was not marijuana but instead was Addie's loose-leaf tea. Rather than conducting further investigation, the deputies prepared a search warrant affidavit relying solely on the loose-leaf tea found in the garbage and Bob's shopping trip to a garden store eight months earlier. A state judge issued the search warrant.

Armed with the search warrant, the deputies—clad in bullet proof vests and guns—raided the Hartes' home just before 7:30 a.m. on April 20, 2012. Bob opened the front door and the deputies flooded in the foyer. Bob ended up on the ground

5

with an assault rifle pointed at or near him. The deputies ordered Addie and the couple's two young children to sit cross-legged against a wall. A deputy eventually allowed the family to move to the living room couch where an armed deputy kept watch over them.

After searching the home for about fifteen to twenty minutes, the deputies found the hydroponic tomato garden that was readily visible from the exterior of the home through a front-facing basement window. And after ninety minutes of extensive searching, a couple of the deputies claimed to smell the "faint odor of marijuana" at various places in the residence. A drug-detection dog showed up, but did not alert the officers to any other areas of the house requiring further searches. The dog's handler also did not smell marijuana.

Before leaving the residence empty-handed, the deputies "strongly suggested" to the Hartes that their 13-year-old son was a drug user. The deputies recommended the Hartes drug test him and have a family meeting to discuss their family problems.

A year and a half later Plaintiffs sued Defendants. Count I of Plaintiffs' operative complaint challenged the search warrant under Franks v. Delaware, 438 U.S. 154, 171–72 (1978), which held if substantial evidence exists to support deliberate falsehood or reckless disregard for the truth, and the exclusion of false statements would undermine the existence of probable cause, a warrant is invalid. Specifically, Plaintiffs asserted: (1) the deputies lied about the results of the field tests they performed on the wet vegetation they found in the trash; (2) the deputies misinterpreted the test results of the vegetation, construing negative results as

6

positive; and (3) assuming that the deputies actually received positive results, they recklessly disregarded the truth—that the vegetation was tea—by relying solely on inaccurate field tests and failing to conduct a thorough investigation.[1]

Count II alleged that the deputies unreasonably executed the search warrant in violation of the Fourth and Fourteenth Amendments. Specifically, Count II raised the following issues: (1) whether Defendants properly executed the warrant, (2) whether probable cause dissipated after the deputies found and tested the hydroponic tomato garden, (3) whether the deputies exceeded the scope of the warrant by searching for evidence of general criminal activity, and (4) whether the deputies unreasonably prolonged Plaintiffs' detention.[2]

---

[1] Although Plaintiffs' complaint alleges a <u>Franks</u> claim in only broad terms, their summary judgment and appellate briefing articulated three distinct theories or claims. <u>Harte v. Bd. of Comm'rs of the Cty. of Johnson, Kan.</u> 864 F.3d 115, 1199 n.2 (10th Cir. 2017) ("<u>Harte I</u>") (Moritz, J.). On appeal, the Hartes asserted a new <u>Franks</u> claim—that the deputies never field tested the tea leaves at all and that they lied about doing so.

[2] Defendants dispute that Count II contained any claims beyond proper execution of the warrant and dissipation of probable cause. But Plaintiffs' complaint contained all four of these claims. In Count II, Plaintiffs alleged that Defendants "continued to occupy the Hartes' home for another 2 ½ hours [after probable cause dissipated], engaging in an illegal search in the hope of finding *anything* incriminating to pin on Plaintiffs." Plaintiffs further alleged that Defendants "also told Plaintiffs that they were not free to leave and held them under the control of an armed deputy on their couch, thus subjecting Plaintiffs to illegal arrest," and that "Defendants knew or should have known that they lacked any probable cause whatsoever to continue their search of Plaintiffs' home and to maintain their detention and arrest of Plaintiff." Plaintiffs' thus alleged each of the four theories in their Second Amended Complaint.

7

Like the first two claims, Plaintiff brought Count III pursuant to 42 U.S.C. § 1983, alleging that law enforcement used excessive force in violation of the Fourth and Fourteenth Amendments. Plaintiffs also brought a claim for municipal liability under Monell v. Department of Social Services, 436 U.S. 658 (1978). Finally, Plaintiffs asserted state-law claims against Defendants for trespass, assault, false arrest and imprisonment, abuse of process, intentional infliction of emotional distress, and false light invasion of privacy.

In December 2015, the district court granted summary judgment on all claims, concluding that: (1) Plaintiffs did not show that the warrant lacked probable cause and, thus, Defendants' search of Plaintiffs' residence was lawful and no constitutional violation occurred; (2) even assuming that probable cause dissipated at some point during the deputies' search of Plaintiffs' residence, Defendants did not violate clearly established law; (3) Defendants' use of force on the scene was objectively reasonable and not excessive; and (4) because no underlying constitutional violation by any individual was present, Plaintiffs' Monell and state-law claims failed because the warrant entitled Defendants to enter the home, search it, and detain Plaintiffs during the search.

Plaintiffs appealed to this Court. Harte v. Bd. of Comm'rs of the Cty. of Johnson, Kan., 864 F.3d 1154 (10th Cir. 2017) ("Harte I"). We issued a per curiam opinion in Harte I, with which two judges concurred. We reached the following disposition of the claims:

8

We **AFFIRM** the district court's grant of summary judgment on all claims asserted against defendant Jim Wingo. We similarly **AFFIRM** as to the plaintiffs' excessive force and <u>Monell</u> liability claims. However, we **REVERSE** the district court's grant of summary judgment on the unlawful search and seizure claims asserted against the remaining defendants. On remand, plaintiffs' claim under <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), is limited to their theory that one or more of the remaining defendants lied about the results of the field tests conducted in April 2012 on the tea leaves collected from the plaintiffs' trash. We further **REVERSE** the grant of summary judgment as to the four state-law claims raised on appeal. We **REMAND** these claims to the district court for further proceedings not inconsistent with these opinions.

<u>Id.</u> at 1158.

This per curiam opinion resulted from the panel—Judge Lucero, Judge Phillips, and Judge Moritz—issuing three separate opinions.

A. <u>Judge Lucero's Opinion</u>

Judge Lucero first concluded as to Count I—Plaintiffs' challenge to the search warrant under <u>Franks</u>—that the record evidence created a triable issue of fact as to whether Deputies Burns and Blake lied about having conducted the field tests on Plaintiffs' trash, or about having obtained positive results for THC. <u>Id.</u> at 1162. After analyzing the record evidence, Judge Lucero stated that the facts, when viewed together, were sufficient to permit a conclusion that the officers fabricated the positive field tests and that the district court erred in granting summary judgment on Count I. <u>Id.</u> at 1163.

Regarding Count II—Plaintiffs' claims for unreasonable execution of the search warrant—Judge Lucero believed that the record was sufficient to support all of Plaintiffs' § 1983 claims, including their allegations of an unlawful seizure.

9

Although Judge Lucero did not specifically mention each sub-claim for the unreasonable execution of the search warrant, he unambiguously voted to deny qualified immunity as to Plaintiffs' unlawful seizure claims. Id. at 1161–62. He stated that because a genuine dispute of material fact existed regarding the validity of the search warrant, he voted to reverse summary judgment as to Plaintiffs' unlawful seizure claim. Id. at 1163. He also stated that if the search was illegal and not supported by probable cause, then the justification for using the search as the foundation for the seizure disappeared. Id. He further stated that the deputies had no probable cause at *any* step of the investigation and that "[a]ny further search of the home," for whatever reason, "or detention of the Hartes" after probable cause had "dissipated . . . was a violation of the Fourth Amendment." Id. at 1164 n.5.

As to both Count III—excessive force—and Count IV—municipal liability—Judge Lucero voted to deny qualified immunity. Finally, Judge Lucero concluded the district court inappropriately entered summary judgment on all four state-law claims.

B. Judge Phillips' Opinion

In contrast to Judge Lucero, Judge Phillips believed none of Count I survived. Judge Phillips believed that the record did not support Plaintiffs' claim that Deputy Burns lied in his affidavit. Id. at 1174. He said that he could not reasonably infer from the facts in the record that the officers lied about field-testing the vegetation or about the test results. Id. at 1175. Judge Phillips also concluded that Deputy Burns did not omit material information or include material misstatements in his search warrant affidavit. Id. at 1176. Because, in Judge Phillips' view, the evidence did not

10

support Plaintiffs' claim that the deputies lied or recklessly misrepresented information in the search warrant affidavit, he concluded the search warrant complied with the Fourth Amendment. Id. at 1179. But even if it did not, Judge Phillips still could not conclude that the deputies violated clearly established law; thus concluding that the deputies were entitled to qualified immunity. Id.

As to Count II, Judge Phillips agreed with Judge Lucero that probable cause had dissipated when the deputies had learned that Plaintiffs had not been growing marijuana. Judge Phillips also agreed that, at that point, the deputies were no longer permitted to rummage for any evidence of marijuana or drug paraphernalia and detain Plaintiffs while doing so. Id. at 1182. Specifically, Judge Phillips believed that discovering tomato plants and other vegetables in the basement dispelled any probable cause the deputies may have had that Plaintiffs were steadily harvesting and growing marijuana. Id. at 1184. He further determined that the absence of sealed or blacked-out windows, fans, ventilators, drying racks, and scales supported this. Id. Relatedly, Judge Phillips concluded that the tenuous probable cause that Plaintiffs might have used marijuana depended on their growing marijuana. Id. Thus, when the probable cause for growing marijuana dissipated, Judge Phillips reasoned, the already weak probable cause of personal use also dissipated. Accordingly, by ignoring everything they learned and rummaging for marijuana, Judge Phillips determined that the deputies violated the Fourth Amendment. Of note, he said that the deputies failed to credibly explain why they continued to search after having concluded that Plaintiffs had not been growing marijuana. Id. at 1187. He also said

11

that the deputies could no longer search for "any kind of criminal activity" in the house. Id. With that said, even though Judge Phillips determined that the deputies violated Plaintiffs' Fourth Amendment rights by unreasonably continuing to search after probable cause had dissipated and by unreasonably extending Plaintiffs' detention, he did not believe that the deputies violated clearly established law. Id. at 1188. Accordingly, Judge Phillips would have affirmed summary judgment on Count II on that basis.

As to Count III—Plaintiffs' excessive force claim—Judge Phillips said that the law in this area was not clearly established and voted to affirm summary judgment.

As to Count IV—the supervisory liability claim—Judge Phillips posited that the claim lacked merit and voted to affirm the district court's entry of summary judgment.

Finally, as to the state law claims, Judge Phillips, would have upheld summary judgment on Plaintiffs' trespass and assault claims, but reversed on Plaintiffs' intentional infliction of emotional distress and false arrest claims.

C. Judge Moritz's Opinion

Judge Moritz staked a position between Judge Lucero's view that Count I survived in its entirety and Judge Phillips' view that Count I failed in its entirety. Judge Moritz believed that a jury may conclude that the same pressure that caused a shoddy investigation also motivated the deputies to manufacture false test results. Id. at 1202. That evidence, in conjunction with a negative test result from the same tea leaves, created a genuine dispute of material fact as to whether the deputies lied

12

about the field test results.  Id.  Judge Moritz therefore concluded that the district court erred in entering summary judgment on Plaintiffs' first Franks claim.  Id.  On the other hand, she concluded that Plaintiffs failed to demonstrate that the second and third Franks claims—that the deputies misinterpreted the test results of the vegetation, construing negative results as positive and assuming that the deputies actually received positive results, they recklessly disregarded the truth—were clearly established violations.  Id.  Judge Moritz, however, refused to consider the new Franks claim Plaintiffs asserted on appeal because Plaintiffs did not make the argument to the district court and did not request plain error review.  Id. at 1199 n.2.

Again, with respect to Count II, Judge Moritz forged a different path from her colleagues.  In light of the one Franks claim surviving summary judgment, she stated that she would also conclude that Plaintiffs' wrongful search and seizure "*claims*" survive.  Id. at 1203 (making "claims" plural, signifying more than one claim).  She declined to decide whether the deputies had properly executed the warrant on appeal because she believed that the warrant was invalid under Franks.  She also believed that Plaintiffs abandoned the dissipation theory on appeal but nonetheless opined that the deputies had exceeded the scope of the warrant by searching for evidence of general criminal activity.

As to Count III—Plaintiffs' excessive force claim—Judge Moritz agreed with Judge Phillips that the law in this area was not clearly established and voted to affirm summary judgment.

13

As to Count IV—the supervisory liability claim—Judge Moritz agreed with Judge Phillips that the claim lacked merit and voted to affirm the district court's entry of summary judgment.

Finally, Judge Moritz agreed with Judge Lucero that the district court inappropriately entered summary judgment on all four state-law claims.

D. The District Court's Actions on Remand

On remand, the district court issued an order delineating which specific claims remained for trial. It acknowledged the Franks claim based on the limited theory that one or more of the remaining Defendants lied about the results of the field tests, which meant that the warrant was invalid and, in turn, that the resulting search and seizure was unconstitutional remained. The district court, over Plaintiffs' objections, declined to read our opinion as requiring *any* other federal law claim to proceed to trial. It did, however, recognize that the four state-law claims remained.

Plaintiffs tried their case to a jury. The jury returned its verdict in favor of Defendants on all issues and claims. Specifically, the jury found that Plaintiffs failed to prove by a preponderance of the evidence that any of the Defendants who participated in obtaining the warrant lied about the results of the field tests. The jury also found that probable cause did not dissipate at any time during the search of the residence. Accordingly, pursuant to the court's instructions, the jury did not need to decide the trespass and false arrest claims. Finally, the jury found that Plaintiffs failed to prove by a preponderance of the evidence their claims of assault or outrageous conduct causing severe emotional distress against any Defendant. The

14

district court ordered Plaintiffs to pay Defendants' costs and denied Plaintiffs' motion for a new trial.

Plaintiffs now appeal, arguing that the district court: (1) violated the "mandate rule"—that is, the rule stating a lower court lacks the authority to deviate from the mandate issued by an appellate court—by prohibiting them from proceeding to trial on their federal search and seizure claim (Count II); (2) violated their right to an impartial jury and nondiscriminatory juror selection process by overseeing the creation of an all-white jury that contained two jurors who were biased against Plaintiffs; (3) erred by refusing to order a new trial after defense counsel had violated the district court's order by making improper and prejudicial comments that had been intended to inappropriately call into question the credibility of one of Plaintiffs' expert witnesses; (4) erred by excluding "damning emails" Defendants produced after a Defendant had waived privilege during trial; (5) erred by refusing to adhere to what Plaintiffs believe was the prior panel's majority holding that permitted Defendants to search and detain only until they learned that no marijuana-grow operation existed and refusing to enter judgment as a matter of law for Plaintiffs on their trespass and false arrest claims; and (6) erred by refusing to instruct the jury that probable cause had dissipated when Defendants had learned that Plaintiffs did not have a marijuana grow operation.[3]

---

[3] Plaintiffs filed a Motion to File Supplemental Appellants' Appendix. We GRANT Plaintiffs' Motion and deem the Supplemental Appellants' Appendix filed. Defendants filed a Motion to Strike Appellants' Additions to Appendix Volume III. We DENY Defendants' motion to strike these documents.

## II.

## A.

Under the law of the case doctrine, "once a court decides an issue, the same issue may not be relitigated in subsequent proceedings in the same case." Ute Indian Tribe of the Uintah & Ouray Reservation v. Utah, 114 F.3d 1513, 1520 (10th Cir. 1997). The "mandate rule," an important corollary of the law of the case doctrine, "provides that a district court must comply strictly with the mandate rendered by the reviewing court." Id. (internal quotation marks omitted). The mandate rule "generally requires trial court conformity with the articulated appellate remand." United States v. Shipp, 644 F.3d 1126, 1129 (10th Cir. 2011) (internal quotation marks omitted). "Interpretation of the mandate is an issue of law that we review de novo." Id.

We recognize that the district court faced the unenviable task of analyzing three separate opinions on remand. Although none of these individual opinions carries binding precedential effect, our per curiam "mandate" had the concurrence of two judges and is therefore the law of the case. See AUSA Life Ins. Co. v. Ernst & Young, 39 F. App'x 667, 669 (2d Cir. 2002) (cited for persuasive value only); cf. Marks v. United States, 430 U.S. 188, 193 (1977) ("When a fragmented [Supreme] Court decides a case and no single rationale explaining the result enjoys the assent of [a majority], 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds.'" (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens,

16

JJ.))). The per curiam portion of the opinion, however, has generated strong debate and disagreement among Plaintiffs, Defendants, and the district court.

The parties agree as to the scope of the mandate regarding Counts I, III, IV, and the supplemental state-law claims. Plaintiffs and Defendants agree that as to Count I, which challenged the validity of the warrant, the per curiam opinion allowed only the Plaintiffs' first argument to proceed to trial—that the deputies lied about the results of the field tests they performed on the wet vegetation they found in the trash. As to Count III—Plaintiffs' excessive force claim—Plaintiffs and Defendants agree that we held this area of law was not clearly established. As to Count IV—the supervisory liability claim— Plaintiffs and Defendants agree that we held Plaintiffs' claim lacked merit. Regarding the state-law claims, Plaintiffs and Defendants agree that we concluded the district court inappropriately entered summary judgment on all four claims.

The disagreement and confusion revolve around Count II. Plaintiffs contend the district court violated the mandate rule by prohibiting them from proceeding to trial on Count II—their federal search and seizure claims. Defendants respond that the district court complied with the prior panel's mandate because the prior panel rejected each search and seizure theory. Both Defendants and the district court believed the search and seizure claim did not survive independently of the Franks claim.

We begin with the proposition that "only the *per curiam* opinion is the court's holding." McClatchy Newspapers, Inc. v.NLRB, 131 F.3d 1026, 1029 (D.C. Cir.

17

1997). Indeed, where only one judge endorses a theory, that theory "cannot be viewed as the rationale of the court." United States v. Sariles, 645 F.3d 315, 318 (5th Cir. 2011) (quoting United States v. Duggan, 743 F.2d 59, 84 (2d Cir. 1984)); see also Int'l Union of Operating Eng'rs, Local 139, AFL-CIO v. J.H. Findorff & Son, Inc., 393 F.3d 742, 747 (7th Cir. 2004) ("the three members of the panel wrote separately, and none spoke for a majority").

In the analogous context of a fragmented Supreme Court decision where five Justices do not assent to a single rationale, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds."[4] Large v. Fremont Cty., Wyo., 670 F.3d 1133 (10th Cir. 2012) (quoting Marks, 430 U.S. at 193). We have held that "[i]n practice, however, the Marks rule produces a determinative holding only when one opinion is a logical subset of other, broader opinions." Id. (quoting United States v. Carrizales-Toledo, 454 F.3d 1142, 1151 (10th Cir. 2006)) (internal quotation marks omitted). So, "for example, one inquiry under Marks might be whether the concurrence posits a narrow test to which the plurality must *necessarily* agree as a logical consequence of its own, broader position." Id. (internal quotation marks omitted). "When, however, one opinion supporting the judgment does not fit entirely within a broader circle drawn by others, Marks is problematic." Id. Thus, "[w]e do not apply Marks when the

_____

[4] Courts apply the Marks doctrine to determine the precedential effect of multiple opinions. We acknowledge that the situation we address today is different. Instead of determining the *precedential* effect of multiple opinions, we are considering the *law-of-the-case* effect of the opinions.

18

various opinions supporting the Court's decision are mutually exclusive." Id.; see also Ass'n of Bituminous Contractors, Inc. v. Apfel, 156 F.3d 1246, 1253–54 (D.C. Cir. 1998) (providing that the rule that "the opinion of the Justices concurring in the judgment on the 'narrowest grounds' is to be regarded as the Court's holding, does not apply unless the narrowest opinion represents a common denominator of the Court's reasoning and embodies a position implicitly approved by at least five Justices who support the judgment" (internal quotation marks and brackets omitted)).

In interpreting the prior panel's holding as to Count II, we look to the language of the per curiam opinion. The per curiam opinion reversed the district court's grant of summary judgment on the unlawful search and seizure *claims*. The judges did not delineate the four issues Plaintiff raised in Count II. Accordingly, Plaintiffs argue that the prior panel intended for Count II to proceed in its entirety while Defendants contend the individual opinions foreclose that argument.

Plaintiffs' first theory— whether Defendants properly executed the warrant— is tied to the Franks claim contained in Count I. Judge Lucero stated that because a genuine dispute of fact existed regarding the validity of the search warrant, the Court also had to reverse the unlawful seizure claim. Judge Moritz reasoned that because she would hold that the warrant was invalid under Franks, she would decline to decide whether the deputies properly executed the warrant. As mentioned above, Judge Phillips believed that the deputies did not violate clearly established law.

Plaintiffs' second theory—dissipation of probable cause after the deputies found and tested the hydroponic tomato garden, i.e., whether the law required the

19

deputies to leave immediately—is more complex. Each of the three judges utilized unique reasoning. As to the merits, two judges—Judge Lucero and Judge Phillips—both believed probable cause dissipated when the deputies had learned that Plaintiffs had not been growing marijuana. But while Judge Lucero voted to reverse summary judgment on the dissipation theory, Judge Phillips voted to affirm summary judgment because he believed the law was not clearly established. Judge Moritz, in contrast, believed Plaintiffs abandoned their dissipation argument.

Accordingly, two judges agreed that Plaintiffs did not abandon the dissipation theory and that probable cause in fact dissipated. Under that rationale, Plaintiffs assert, the district court erred in not allowing Count II to proceed to trial. But defendants point to the fact that a different combination of two judges voted to affirm summary judgment on the dissipation claim. Thus, Defendants argue, the district court correctly decided not to try Count II.

Plaintiffs and Defendants likewise disagree on the prior panel's disposition of Plaintiffs' third and fourth theories—whether the deputies exceeded the scope of the warrant by searching for evidence of general criminal activity and whether the deputies unreasonably prolonged Plaintiffs' detention by holding them under the control of an armed deputy, thus subjecting Plaintiffs to illegal arrest. Judge Phillips concluded Plaintiffs presented sufficient evidence to show that the deputies violated the Fourth Amendment's reasonableness requirement by continuing to search after probable cause had dissipated. He stated that because at least some length of the search was unreasonable, and officers can detain occupants of a house only while the

20

search remains proper under the warrant, Plaintiffs' continued detention was also unreasonable. Again, however, Judge Phillips voted to affirm summary judgment because the law prohibiting the officers' conduct was not clearly established.

Although Judge Lucero did not list each of the issues in Count II, his opinion unambiguously expressed his intent to reverse the district court on Count II in its entirety.

Like Judge Lucero, Judge Moritz did not break out each issue contained in Count II. She reasoned that because she concluded that one of the Franks claims survived summary judgment, she "would also conclude that the Hartes' wrongful search and seizure *claims* necessarily survive." Harte I, 864 F.3d at 1203 (Moritz, J.) (emphasis added). After carving out Plaintiffs' dissipation theory as abandoned, Judge Moritz noted that Plaintiffs had, in fact, argued that the officers had exceeded the scope of the warrant by searching for evidence of general criminal activity. She did not mention the prolonged detention argument.

One thing is clear—no single opinion from the prior panel commanded majority support, even though two members of the panel agreed on a result. Judge Lucero voted to reverse summary judgment on every issue in Count II. Judge Phillips, on the other hand, voted to affirm summary judgment on every issue in Count II. Therefore, we examine the per curiam position in light of Judge Moritz's position.

The per curiam opinion reversed the district court's entry of summary judgment regarding Plaintiffs' search and seizure claims. The per curiam opinion's

21

use of the plural "claims" is enough alone for us to conclude the district court erred by allowing only the one federal <u>Franks</u> claim to proceed to trial.

Furthermore, we believe that Judge Moritz's and Judge Lucero's opinions, when read together with the controlling per curiam opinion, permitted Plaintiffs to proceed to trial on the following federal claims if the jury determined the warrant was valid: (1) whether Defendants properly executed the warrant; (2) whether the deputies exceeded the scope of the warrant by searching for evidence of general criminal activity; and (3) whether the deputies prolonged Plaintiffs' detention.

That leaves the question whether the district court should have allowed Plaintiffs to proceed on the dissipation claim at trial. Plaintiffs argue a common line of reasoning exists between Judge Lucero and Judge Phillips' opinions on dissipation of probable cause. Neither of those judges believed that Plaintiffs abandoned the claim. And only one of the three members of the panel concluded that the law was not clearly established. Because this is the only common reasoning regarding dissipation, Plaintiffs believe dissipation of probable cause (that *was* clearly established) is the narrower holding. Defendants, on the other hand, are more concerned with result. Both Judge Phillips and Judge Moritz voted to reverse the district court on dissipation of probable cause—albeit for unrelated reasons. Accordingly, because two judges agreed on a result, Defendants posit, we should affirm the district court's decision not to allow a trial on the dissipation claim.

We cannot say that as to the dissipation claim the prior panel had a "narrowest" opinion that identifies how we should resolve similar cases in the future.

22

See United States v. Dico, Inc., 189 F.R.D. 536, 543 (S.D. Iowa 1999) (concluding that two opinions premised on distinct constitutional principles cannot later be combined in an attempt to establish a "majority rule") (citing Unity Real Estate Co. v. Hudson, 178 F.3d 649, 658-59 (3d Cir. 1999)). At first blush, Plaintiffs' argument that we should look for common reasoning is an attractive argument. After all, the *only* commonality with respect to dissipation among the three opinions is that two judges believed Plaintiffs had presented sufficient evidence of dissipation to survive summary judgment. And the judges did not limit the scope of Count II on remand as they did with Count I in the per curiam opinion. But in examining a splintered decision, we "should still strive to decide the case before [us] in a way consistent with how [our] opinions in the relevant precedent would resolve the current case." Cf. United States v. Duvall, 740 F.3d 604, 611 (D.C. Cir. 2013) (Kavanaugh, J., concurring in the denial of rehearing en banc). And when applying the prior panel's mandate in the exact same case, that means we need only look to and adopt the *result* the prior panel reached. Cf. id.; City of Ontario v. Quon, 560 U.S. 746, 757 (2010) (reaching result when two "approaches . . . lead to the same result"). In short, that means we must affirm summary judgment as to dissipation. If we reached the opposite conclusion, we would go against the result two of the three prior panel members expressed. That we cannot do.

Accordingly, we affirm the district court's decision not to allow the dissipation claim to proceed to trial but reverse the district court's decision that our prior mandate also barred the remainder of Count II. We remand Count II for further

23

proceedings on the following federal claims: (1) whether Defendants properly executed the warrant; (2) whether the deputies exceeded the scope of the warrant by searching for evidence of general criminal activity; and (3) whether the deputies prolonged Plaintiffs' detention, thus subjecting them to an illegal arrest.

B.

Plaintiffs next posit that the district court erred in seating two jurors who they believed the district court should have dismissed for cause. Additionally, they contend the district court violated Batson v. Kentucky, 476 U.S. 79 (1986), when it struck every minority from the jury.

1.

The Supreme Court has "repeatedly emphasized" that jury selection is "particularly within the province of the trial judge." Skilling v. United States, 561 U.S. 358, 386 (2010) (quoting Ristaino v. Ross, 424 U.S. 589, 594–95 (1976)). "Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record—among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty." Id. This "in-the-moment voir dire"—in contrast to "the cold transcript received by the appellate court"—"affords the trial court a more intimate and immediate basis for assessing a venire member's fitness for jury service." Id. at 386–87. "In reviewing claims of [juror bias], the deference due to district courts is at its pinnacle: A trial court's findings of juror impartiality may be

24

overturned only for manifest error." Id. at 396.  Accordingly, we "review the district court's refusal to strike a juror for cause for an abuse of discretion."  Vasey v. Martin Marietta Corp., 29 F.3d 1460, 1467 (10th Cir. 1994).  "Generally, a court must grant a challenge for cause if the prospective juror's actual prejudice or bias is shown."  Id.

Plaintiffs argue that five jurors expressed actual bias in favor of Defendants and that the district court went out of its way to attempt to rehabilitate each one. Plaintiffs used their peremptory strikes on three of these five prospective jurors. Although the "peremptory challenge is part of our common-law heritage" and courts have "long recognized the role of the peremptory challenge in reinforcing a [litigant's] right to trial by an impartial jury," peremptory challenges are "auxiliary." United States v. Martinez-Salazar, 528 U.S. 304, 311 (2000); Thompson v. Altheimer & Gray, 248 F.3d 621, 624 (7th Cir. 2001) (applying Martinez-Salazar in the civil context and noting that "we cannot think of any difference which that would make"). Indeed, "unlike the right to an impartial jury guaranteed by the Sixth Amendment, peremptory challenges are not of federal constitutional dimension."  Martinez-Salazar, 528 U.S. at 311.  "So long as the jury that sits is impartial," the Sixth Amendment is not violated where a party must use a peremptory challenge to achieve that result.  Id.  We thus examine the district court's decision to seat Juror 17 and Juror 73—the two jurors whom Plaintiffs accuse of bias.

Plaintiffs challenge Juror 17's impartiality based on the following exchange:

THE COURT [to a different juror]: [D]o you believe as you sit here today that you would be able to set aside your positive feelings about law enforcement in general and . . . listen to the evidence, and decide whether or not this case happened in a

25

particular fashion or this situation occurred in a particular way and decide it according to just the evidence and the law?

. . . . [response from the other juror]

JUROR 17: Your Honor, I— I'm really struggling with that, because my age group—grew up in the Army. I grew up with rules and you follow them. There were no questions asked. I myself have been in trouble, I know, I've paid the price for it. So I—I'm really—unless you're going to define that for us, you know, I'm having a hard time with it, because to me there's right and there's wrong, and I don't know if there's a gray here and I guess it's really bothering me.

THE COURT: Thank you for—for raising that. Because in the end, it will be you the jury that will decide if anything was wrong or if anything was right. I will tell you what the law is, in other words what the rules are. The witnesses will tell you what happened or what didn't happen. They may have conflicting versions of what they think happened as—you know, that we probably wouldn't be here if totally everybody agreed. But if they have conflicting views you'll have to assess that and you'll have to decide do I think maybe this witness is somebody I ought to believe as opposed to that witness or whatever.

But in the end, the rules are what I will tell you. And then you will say, all right, if those are the rules, and I think this happened or I think this didn't happen—or put another way, I believe that the plaintiffs either did or did not meet their burden of proof on these things, then you'd get to decide the outcome. That's—that's how it all works.

. . . .

THE COURT: All right.

[PLAINTIFFS' COUNSEL]: Thank you, Your Honor. A question for the whole panel now. Does anyone feel similarly to [Juror 26] that perhaps my clients will start a step or two behind because they're suing the police?

JUROR 17: To be honest with you, yes.

[PLAINTIFFS' COUNSEL]: And is that similarly—well, why—why is that?

JUROR 17: That's the way I was raised. There's right and wrong, and you always call the police. I mean, they're the keepers—they're the—and I can't help—I'm being honest.

. . . .

26

THE COURT: Now, *do you believe that you could set aside your personal views and decide this case just on the law as it is?* If you don't think you could do that, I'll excuse you—

JUROR 17: No, that's—

THE COURT: —and nobody is going to be mad at you.

JUROR 17: *If you define it, then yes.*

THE COURT: *I'll define the rules. You just have to decide what happened and apply it.*

JUROR 17: *Okay. Yes, I think I could.*

THE COURT: Do you think you could do that? Okay.

(emphases added).

The "district court is in the best position to observe the juror and to make a first-hand evaluation of his ability to be fair." Vasey, 29 F.3d at 1467. Juror 17 expressed concern over defining the law. The Court explained to Juror 17 that it—not the jury—would define the law. Even the "cold record" on appeal demonstrates that Juror 17 stated she could set aside her personal views and decide this case on the law as defined by the district court. We conclude the district court did not abuse its discretion in seating Juror 17.[5]

---

[5] Plaintiffs complain that the district court made no effort to rehabilitate the only juror to express bias against one of the Defendants. Specifically, Juror 42 said that he had a "personal bias against Johnson County." The district court then dismissed Juror 42 without additional follow up questioning. The appellate record cannot provide us with the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty. As mentioned above, the district court is in the best position to observe the juror and evaluate him. Vasey, 29 F.3d at 1467. And in its order on Plaintiffs' motion for a new trial, the district court provided some

27

For the first time, on appeal, Plaintiffs argue that the Court should have struck Juror 73 because that juror was a patron of the Fraternal Order of Police Chiefs who drove a car displaying a sticker supporting the Council of Police Chiefs. In the district court, Plaintiffs filed a motion for a new trial, arguing that the district court should have struck three prospective jurors and *one* seated juror—Juror 17. Plaintiffs have therefore forfeited their argument regarding Juror 73, which means that they must satisfy plain error review to prevail on this argument on appeal. Richison v. Ernest Grp., 634 F.3d 1123, 1130–31 (10th Cir. 2011). Plaintiffs, however, do not argue for plain error on appeal. That "surely marks the end of the road for an argument for reversal not first presented to the district court." Id. at 1131 We thus decline to review Plaintiffs' argument regarding Juror 73 on appeal in the first instance.

---

insight into the voir dire of that juror. The district court addressed Plaintiffs' contention that it should have asked the juror the "do or die" question on impartiality. The district court said it observed the juror's demeanor, heard the juror's "clear and emphatic expression of bias," and "concluded that any effort at rehabilitation or explanation was both futile and an inefficient use of the court's time and the jury's time." The district court therefore did not abuse its discretion in excusing Juror 42 without further questioning after he expressed actual bias against Johnson County.

28

2.

During voir dire, the district court struck for cause the only black juror. Defendants additionally exercised two peremptory strikes against a Hispanic male and an Asian female, which left no minority jurors in the venire.

In Batson v. Kentucky, the Supreme Court held that purposeful discrimination based on the race of a juror violates the Equal Protection Clause of the Fourteenth Amendment. 476 U.S. 79, 89 (1986). The Batson analytic is well settled. Hidalgo v. Fagen, Inc., 206 F.3d 1013, 1019 (10th Cir. 2000). "Once the party raising the Batson challenge establishes a prima facie case of racial discrimination, the proponent of the peremptory strike must submit a racially neutral explanation." Id. We then provide the party raising the challenge the opportunity to show pretext. Id. The trial court subsequently "must decide whether the party raising the Batson claim has proven purposeful discrimination." Id. The party making the challenge bears the ultimate burden of persuasion. Id. We review the proffered racially neutral explanation de novo and the district court's ultimate finding of no intentional discrimination for clear error. Id.

The district court excused Juror 42, a black male, without attempting to rehabilitate him after he expressed a "personal bias against Johnson County." Plaintiffs raised a Batson challenge. Plaintiffs claim that when several white jurors expressed bias, the district court rehabilitated each one. They argue this "context" is "devastating" and "a textbook example of how the District Court's decision to strike

29

a single black juror for bias can in fact be one piece of a larger picture of discriminatory treatment."

But their contention that the district court did not strike a single white juror is not true. The district court struck Juror 31, a white male, for cause because of his business relationships with Defendants. While the dismissal of a non-minority juror does not erase alleged Batson claims, it demonstrates that the "context" Plaintiffs rely on is not as strong as they suggest.

Even more significantly, Juror 42 interrupted the district court's general inquiry on hardship posed to the entire seated panel, stood up, and announced his bias against Johnson County stating that he did not think he "would be unbiased in this case." After observing this, the district court pointed out that "any effort at rehabilitation or explanation was both futile and an inefficient use of" everyone's time. The district court thus determined that Juror 42 could not be impartial and dismissed him. "Generally, a court must grant a challenge for cause if the prospective juror's actual prejudice or bias is shown." Vasey, 29 F.3d at 1467. In light of Juror 42's unsolicited expression of bias against Johnson County, the district court did not abuse its discretion by striking Juror 42 from the jury.

Juror 66 is an Asian female. The district court stated that the strike of Juror 66 "certainly" constituted "a *prima facie* [Batson] case" because Juror 66 is the same race as Plaintiff L.H. Defendants then offered a race-neutral justification for the peremptory strike: Juror 66 had first-hand experience with an unlawful search that she believed law enforcement officers caused because of improper racial motivations.

30

Specifically, Juror 66 is married to an African-American man, and she described two situations when she felt uncomfortable with how law enforcement treated her husband. Defendants first unsuccessfully attempted to strike Juror 66 for cause because of her negative encounters with law enforcement and because she was taking pain medication, believed growing marijuana should be legal, and believed marijuana laws are too harsh in general. The district court overruled Plaintiffs' Batson objection and found Defendants' justification credible and not pretextual.

We find no clear error with the district court's conclusion. Plaintiffs contend that Defendants' proffered explanation for the strike has everything to do with Juror 66's husband's race. But as mentioned above, Defendants offered a race-neutral reason for the peremptory strike. And regardless of race, a juror's admission that a law enforcement officer treated a spouse unfairly and subjected him to an unlawful search is a legitimate concern. And that concern is especially reasonable and strong when choosing a jury in an unlawful search case.

Plaintiffs' second Batson challenge to Defendants' peremptory strikes involved Juror 41—the only Hispanic individual in the jury box. The district court permitted Defendants to use a peremptory strike to remove Juror 41 because, in the district court's view, Defendants gave a "perfectly reasonable explanation" for doing so. The district court explained that, unlike Juror 66, who shared a "common [Asian] ethnicity [with] one of the plaintiffs," Juror 41 did not share his Hispanic ethnicity with any of the plaintiffs. According to the district court, that fact alone "diminishe[d] the inference to be drawn from the *prima facie* case." Defendants also

31

put forth other race-neutral explanations to justify their strike, including that Juror 41 had previously worked with people who now worked at the same company as Addie Harte, that Juror 41 was going through a divorce, and that Juror 41 had spoken up briefly about child services (which could have indicated a heightened sensitivity to children). Furthermore, like Juror 66, Juror 41 indicated that he believed marijuana laws are too harsh.

Plaintiffs claim we should reverse the district court's <u>Batson</u> determination as to Juror 41 because "the Supreme Court has never intimated that trial courts may apply the <u>Batson</u> rules differently based on the plaintiff's race or based on a juror's common race with a plaintiff." Although <u>Batson</u> safeguards the "equal protection rights of the challenged jurors" and guarantees them "the honor and privilege of participating in our system of justice," <u>Edmonson v. Leesville Concrete Co.</u>, 500 U.S. 614, 616, 619 (1991), Defendants set forth valid race-neutral explanations to justify their strike. We discern no clear error in the district court's determination that no discriminatory intent was inherent in Defendants' justification.

C.

Plaintiffs' expert witness who field-tested the tea leaves, Michael Bussell, is a former law enforcement officer. At trial, Defendants' counsel told the district court that he intended to ask Bussell the reasons why his employment with the City of Lenexa had ended. Counsel then informed the district court that although Bussell's résumé indicated that he had retired because of an injury, another officer in Bussell's department had previously caught him driving while intoxicated. Defendants'

32

counsel represented that Bussell had thus known that the City had planned on terminating him. In support, counsel pointed to correspondence from the Lenexa police chief to the Kansas Commission on Standards. Plaintiffs' counsel disputed the veracity of Defendants' representations. Specifically, Plaintiffs' counsel referred to Bussell's letter of resignation, which the police chief had supposedly prepared, that stated that Bussell had retired because of a knee injury. The district court nonetheless ruled that Defendants' counsel could ask why Bussell had left the department. Specifically, the district court stated the following:

> THE COURT: Let's see what his answer is. If he says I retired to get a medical whatever, that seems to be consistent maybe. If he says I got a better job, then that's a different answer. I don't know. I want to hear what he says.
>
> You have introduced his employment history and he may be inquired about why he left. Is it because he was the world's greatest officer and therefore hired by another department or was it because he had some issue that may be relevant to his credibility. I don't know but I think he's entitled to ask that question.
>
> *But before you go beyond that question, you're going to have to inquire further of me.* In other words, I'm not—I'm going to be fairly satisfied with any answer on his part that is consistent with some official position that has been taken even [sic] there is something underlying. If what [Plaintiffs' counsel] says is true, I'm assuming it is, that there is some official document that says you're retiring for this particular reason, that's what he says he did, then you're stuck with that. Because that's—there's no basis then to undercut that without going way off into the weeds.
>
> You might not want to ask him, honestly, in my opinion.
>
> [PLAINTIFFS' COUNSEL]: It's clear, Your Honor, it would be improper for [Defendants' counsel] to start saying—referring to the underlying incident just to be very clear; correct?
>
> THE COURT: That would be improper.

33

Later on during cross-examination, Defendants' counsel asked Bussell the following:

Q: And why did you leave that employment [with the City of Lenexa]?

A: I sought a medical retirement because of my knee.

Q: Well, there were other reasons, weren't there?

A: No. That's what I sought was a medical retirement for my knee.

Q: I think there were other reasons that are documented, sir.

After Plaintiffs objected, the district court said that it would not allow further questioning.

Plaintiffs contend that they are entitled to a new trial because Defendants violated a district court order by making "highly prejudicial comments" to the jury about Bussell. The district court denied the motion for a new trial on that ground, stating that Defendants' counsel had not indicated the substance of any other reasons that might have existed for Bussell's decision to leave his employment. The district court recognized that the comment may have carried a negative implication but reasoned that counsel had "stopped well short of identifying any misconduct on the part of Mr. Bussell." The district court additionally noted that Plaintiffs did not seek a contemporaneous instruction for the jury to disregard the comment. The district court acknowledged, however, that it had instructed the jury before the opening statements that statements, arguments, and questions by lawyers are not evidence and that the jury could not consider them.

We review the district court's denial of Plaintiffs' motion for new trial for an abuse of discretion. Deters v. Equifax Credit Info. Servs. Inc., 202 F.3d 1262, 1268 (10th Cir. 2000). Plaintiffs argue that a rebuttable presumption of prejudice arises whenever a jury is exposed to external information in contravention of a district court's instructions. Although we agree with that proposition, see Mayhue v. St. Francis Hosp. of Wichita, Inc., 969 F.2d 919, 922 (10th Cir. 1992), and agree that Defendants pushed the boundaries of the district court's ruling, Defendants did not expose the jury to external information in contravention of the district court's instructions. We agree with the district court's assessment that the presumption of prejudice did not arise and thus hold that the district court did not abuse its discretion in denying the motion for a new trial on this basis.

## D.

Plaintiffs next take issue with the district court's ruling on the admission of certain emails. Following the raid on their home, Plaintiffs' asked law enforcement for information regarding the raid. They requested items such as the probable cause affidavit for the warrant, a copy of the reports regarding the search, the photographs law enforcement captured, the audio and the video of the raid, and reports related to surveillance that law enforcement carried out on their home. During trial, Plaintiffs' counsel asked Sheriff Frank Denning why he never gave Plaintiffs any of this information. The following exchange occurred:

> Q: Do you recall whether you were personally involved in deciding to not give the Hartes their records?

35

A: I had several conference calls with my outside counsel.

…

Q: You could have said, well, sorry, captain, I'm the sheriff, I disagree, we're going to give the Hartes their records; right?

A: No, because I'm following the advice of counsel.

…

Q: And, oh, the advice of counsel you followed, was the advice of counsel that's sitting here in this courtroom today?

A: Yes.

The parties disagree about whether Sheriff Denning then waived the attorney-client privilege by invoking the advice-of-counsel defense. Regardless, the district court ruled that testimony constituted a waiver of the attorney-client privilege for the limited purpose of protecting communications related to the denial of the records requests. The district court therefore required defense counsel to produce the emails between the Sheriff's Office and counsels' office. Defendants then produced various emails relating to the decision to withhold information.

The next day, Plaintiffs attempted to introduce some of the newly disclosed emails into evidence, contending that the emails contradicted Denning's sworn testimony that he had withheld information from the Hartes on the advice of counsel. The parties specifically cite two of these emails on appeal. In one email (Trial Exhibit 1200), Sheila Wacker, Records Unit Supervisor for the Johnson County Sheriff's Office, emailed Kirk Ridgway, one of Defendants' attorneys. Wacker informed Ridgway of the request for information and asked him to call her at his earliest convenience. Ridgway responded that "[s]eeing as how this is from

36

[Plaintiffs' attorney], we'll need to nip this in the bud ASAP. Call when you can."
In a different email, Ridgway corresponded with Johnson County Captain Michael Pfannenstiel and said that "we may want to do damage control and advise the [Hartes] of the wherefores and whys; and if they feel necessary, explain to the neighbors what caused the situation, etc."

Plaintiffs moved to admit Trial Exhibit 1200. The district court admitted the document "for the purpose of exploring the notion of Mr. Denning's testimony about relying on the advice of counsel." But once Plaintiffs' counsel projected the email and read it, the district court interrupted. It stated that the email was "not probative on the issue of whether or not Mr. Denning was told specific reasons why he should not turn things over." The district court stated that the issue was whether Denning had received written correspondence from his attorneys that had told him that he should reject Plaintiffs' information request so as not to disclose a confidential source or the means of the investigation. The district court said that "going into what language the lawyers used to discuss the handling of it is not relevant for the purpose for which [Plaintiffs' counsel] asked to have those e-mails made available." The district court then struck Trial Exhibit 1200 from the record because Plaintiffs introduced it for an improper purpose. Specifically, the district court said, "I ordered them to be produced for one reason and one reason only. They were otherwise protected and I'm not going to let them be used for any purpose other than to refute his particular claim. That's a narrow reading of waiver." The district court went on

to hold that admission of the email also failed under Federal Rule of Evidence 403 as more prejudicial than probative.

Plaintiffs next tried to admit the correspondence between Ridgway and Pfannenstiel. Plaintiffs argued that the email "provides advice they should consider giving an apology, they should consider sending out sheriff's deputies to apologize." The district court did not admit the document because it believed that the document pertained to a collateral matter concerning public relations advice distinct from the issue of legal advice on the information request.

After the district court told Plaintiffs' counsel "repeatedly" that counsel could not go down that path, the following exchange occurred:

> [PLAINTIFFS' COUNSEL]: I do understand you loud and clear, Your Honor. I just want to make sure I can ask the question you put forward that he can't point to any document that was given to him by his counsel.
>
> THE COURT: That's a perfectly permissible question.
>
> …
>
> You can talk about the number of e-mails. You can say, Mr. Denning, can you point to any place in any of that correspondence in which counsel tells you because of the confidential source or protecting the way in which the investigation is supposed to run we shouldn't disclose this. If he says, well, actually there's something over here, fine, that opens things further. I don't think he's going to be able to do that. All right.
>
> (Thereupon, the proceedings continued in open court.)
>
> BY [PLAINTIFFS' COUNSEL]:
>
> Q: Sheriff Denning, I'm just handing you a stack of e-mails and other documents produced by counsel to us shortly before court began this morning
>
> …

38

You heard the court's statement—or instruction or statement to you that your counsel has stipulated that those are the emails regarding the advice provided to your office with respect to your office deciding not to give any open records request documents to the Hartes in 2012.

…

THE COURT [to the witness]: Wait just a minute. Have you answered his question yet as to whether there is anything in those documents which indicates advice from the Ferree law firm based upon the confidential source or the means of the investigation? That's a yes or no.

THE WITNESS: And that would be a no.

…

Q: And you testified earlier that you refused the Hartes' request to provide open records regarding the investigation and search of their home based on the advice of the Ferree law firm; correct?

A: Yes, correct.

[PLAINTIFFS' COUNSEL]: No further questions, Your Honor, and thank you for your patience.

On appeal, Plaintiffs contend that the district court erred by excluding these "damning" emails. They argue that the district court's "narrow reading" of the waiver was unjustifiable as a matter of law and caused prejudice for three reasons. First, they contend that although the evidence squarely contradicted Denning's statements, Plaintiffs were unable to have the opportunity to impeach one of Defendants' most important witnesses. Second, Plaintiffs maintain that Defendants' decision not to provide any explanation to the Hartes in spite of defense counsel's "recommendation to do so" supports their intentional inflection of emotional distress claim. Third, Defendants' decision to ignore counsel's "transparency

39

recommendation" was probative of the Franks claim "because the apparent cover-up suggests underlying misconduct."

"[W]e review the district court's determinations regarding waiver of attorney-client privilege and work product protection for abuse of discretion." Frontier Ref., Inc. v. Gorman-Rupp Co., 136 F.3d 695, 699 (10th Cir. 1998). Additionally, we review decisions to exclude evidence under Federal Rule of Evidence 403 for abuse of discretion. Boardwalk Apartments, L.C. v. State Auto Prop. & Cas. Ins. Co., 816 F.3d 1284, 1289 (10th Cir. 2016).

The district court did not abuse its discretion in excluding the emails from evidence. Neither of the emails involved the issue of whether Denning received advice from his counsel to ignore Plaintiffs' request for information. Indeed, Plaintiffs were able to impeach Denning by asking him whether any of the emails from his counsel advised him to ignore the request. He said, "[N]o," and acknowledged on the stand that that answer contradicted his earlier statement.

Perhaps more importantly, Plaintiffs did not appeal the district court's determination pursuant to Rule 403. In the denial of the motion for a new trial, the district court held that any marginal relevance of the emails was substantially outweighed by Rule 403 considerations, including wasting the jury's time on collateral issues such as exploring the meaning of various phrases utilized by counsel in the emails and potentially confusing the jury on the significance of Denning's rejection of the information request. Even though Plaintiffs do not raise the Rule 403 ruling, Defendants raise it in their response brief to support their argument we should affirm the district court. Regardless

40

of the proper scope of the privilege waiver, we hold that the district court nonetheless did not abuse its discretion in excluding the documents; indeed, because it also concluded that the documents' prejudicial effect outweighed their probative value, we alternatively affirm on that ground alone given that Plaintiffs chose not to appeal the Rule 403 ruling.

E.

Plaintiffs next argue that the prior panel's holding required the district court to enter judgment as a matter of law on the trespass and false arrest claims because Judge Lucero's and Judge Phillips' conclusions regarding dissipation became the law of the case. At trial, the jury concluded that probable cause had not dissipated, but had instead existed for the duration of the search of Plaintiffs' home. Plaintiffs renewed their motion for judgment as a matter of law, which the district court denied.

We review de novo a district court's denial of a motion for judgment as a matter of law. Keylon v. City of Albuquerque, 535 F.3d 1210, 1214–15 (10th Cir. 2008). A judgment as a matter of law tests "whether there is a legally sufficient evidentiary basis for a reasonable jury to find for the moving party." Id. at 1215. But "[i]n our review of the record, we will not weigh evidence, judge witness credibility, or challenge the factual conclusions of the jury." Deters 202 F.3d 1268. "We consider the evidence, and any inferences drawn therefrom in favor of . . . the non-moving party." Id.

Plaintiffs argue that Judge Lucero and Judge Phillips held that probable cause had dissipated the moment the law enforcement officers had learned they would not find a marijuana grow operation. Based on this conclusion, Plaintiffs contend that

41

the district court should have informed the jury that probable cause had dissipated at that moment. Assuming that is the case, according to Plaintiffs, the law enforcement officers lacked probable cause after just fifteen to twenty minutes of arriving on the scene, which meant that Plaintiffs' continued detention after probable cause dissipated amounted to a trespass and false arrest.

Defendants, on the other hand, contend that the jury reasonably concluded that probable cause had continued for the duration of the search based on the evidence presented at trial. They believe that Judge Moritz's disposition of the state law claims controlled. Judge Moritz, joined by Judge Lucero, vacated the entry of summary judgment on the four state law claims. But even if Judge Lucero and Judge Phillips' opinions regarding dissipation controlled, Defendants argue that any such conclusion was not binding on the jury because the prior panel viewed the facts in the light most favorable to Plaintiffs in reviewing the district court's rulings on qualified immunity and summary judgment. On remand, Defendants asserted the prior panel's decision allowed a trial on the disputed issues of fact, which included whether probable cause had, in fact, dissipated.

Plaintiffs counter that the prior panel was dealing with the plain language of the warrant and affidavit. Because the language of the warrant and the affidavit is not in dispute, Plaintiffs argue that Judge Lucero and Judge Phillips were not construing the relevant facts in their favor for purposes of the qualified immunity motion. Accordingly, Plaintiffs contend that Judge Lucero's and Judge Phillips' conclusions regarding dissipation became the law of the case.

42

In addressing dissipation, the prior panel examined the facts in the context of qualified immunity. Indeed, the Court construed the facts in the light most favorable to Plaintiffs and made all reasonable inferences from the evidence in Plaintiffs' favor. Judge Phillips said as much in footnote 11 of his opinion. He acknowledged that the law enforcement officers had maintained on appeal that it had taken them an hour or hour and a half to determine that Plaintiffs had no active or dismantled grow operation. But Judge Phillips pointed out that they had not explained why they needed so much time to reach this conclusion. Judge Phillips said, "especially making all reasonable inferences from the evidence *in the Hartes' favor*, I conclude that the deputies reasonably knew that the Hartes had no marijuana grow operation early in the search." Harte I, 864 F.3d at 1183 (Phillips, J.) (emphasis added).

Judge Moritz, joined by Judge Lucero, held that because the district court had entered summary judgment on Plaintiffs' state-law claims partly because it had concluded that there had been no Franks violations, the district court's grant of summary judgment on the four state-law claims should be reversed. Id. at 1203 (Moritz, J.).

We agree with the district court that Plaintiffs were not entitled to judgment as a matter of law on the trespass and false arrest claims. When the prior panel denied qualified immunity on some claims and reversed the entry of summary judgment for the Defendants on the state-law claims, it acknowledged the existence of a factual dispute. The district court did not commit reversible error when it denied Plaintiffs'

43

motion for judgment as a matter of law and allowed the trier of fact determine whether probable cause dissipated.[6]

We turn to whether a reasonable jury would have a legally sufficient evidentiary basis to find for the Defendants on the trespass and false-arrest claims. Again, whether we would have weighed the evidence differently than the jury is irrelevant. Even so, as explained in more detail below, the record shows that a reasonable jury could have concluded that probable cause did not dissipate at any time during the search of Plaintiffs' home. Viewing the evidence in the light most favorable to Defendants, a jury could find that law enforcement had a reasonable basis to believe that evidence of a dismantled grow operation or evidence of recently harvested marijuana existed in the home.

At trial, Defendants appeared to address Judge Phillips' question of why they needed so much time to conclude that Plaintiffs had not had an active or dismantled grow operation. Deputy Blake, for instance, testified that he believed that the hydroponic-grow operation had all the components of a marijuana-grow operation. He testified that up to that point in time, he had never seen a layout of a hydroponic-

---

[6] We have long recognized that probable cause is a jury question in civil rights suits. DeLoach v. Bevers, 922 F.2d 618, 623 (10th Cir. 1990). "It is true that the issue of probable cause ordinarily is for the judge rather than the jury." Id. But we explained that is because "the issue usually arises in the context of a motion to suppress evidence, which the judge decides." Id. In a damages suit, however, where room for a difference of opinion exists, it is a proper question for the jury. Indeed, the underlying issue in deciding whether law enforcement had probable cause to do what they did is one of reasonableness, "which is also the underlying issue in deciding negligence—a classic jury issue." Id.

grow operation similar to Plaintiffs' that was not being used to grow marijuana. To illustrate, Blake testified that he had noticed nine empty pots in the garden. To Blake, that signified that Plaintiffs had already harvested their marijuana and had moved it somewhere else, which had given them reason to continue the search. Blake further testified that if the marijuana had been altered, Plaintiffs potentially could have hidden it in the most minute spaces. And if they were seeds, they could have been hidden anywhere. Other deputies agreed that the empty cups, in their experience, had made it appear that somebody had previously harvested marijuana and had stored it elsewhere in the home. Furthermore, the district court allowed the deputies to testify that the hydroponic garden had been an expensive setup. The deputies testified that the search had lasted as long as it did because of the size of the house. Another deputy testified that as he was proceeding up the stairs to the bedroom level, he had detected a whiff of marijuana.

These facts, taken together with the evidence that the deputies knew that the loose-leaf tea gathered in the trash pulls had tested positive for marijuana, establish that a jury could conclude that probable cause did not dissipate prior to the end of the search and that the deputies reasonably were still searching for evidence of a past grow operation during that time.

Plaintiffs additionally argue that a jury could not reasonably conclude that probable cause continued after the ninety-minute mark. As the district court noted, this argument is based on the testimony of Deputy Shoop. Shoop testified that at ninety minutes into the search, the deputies had still assumed that Plaintiffs had

45

marijuana in their home. And even if an active grow operation had not been present, then, he testified, the marijuana must have been for personal use. A jury could indeed construe this testimony as evidence that the deputies switched from a search for evidence of a past grow operation to a search for evidence of personal use marijuana. But as the district court pointed out, Deputy Shoop was offering his opinion as the photograph/video officer during the execution of the warrant. We agree with the district court that the jury reasonably could have credited the testimony of other deputies, such as Deputy Blake's testimony, over the testimony of Deputy Shoop. Indeed, Deputy Blake testified that because Plaintiffs could have hidden harvested marijuana anywhere in the house, they had continued to search because the marijuana could have existed in any form.

Accordingly, we affirm the district court's decision not to enter judgment as a matter of law on the trespass and false arrest claims.

F.

At the close of evidence, the Hartes requested a jury instruction on dissipation. The proposed requested instruction read: "Probable cause dissipated when Defendants learned that Plaintiffs had no marijuana-grow operation." The district court rejected this instruction. Instead, it instructed the jury that Defendants could look for "evidence of the criminal activity giving rise to the underlying probable cause supporting the issuance of the warrant." That instruction also informed the jury that "[i]f one or more or the individual defendants discovered additional facts or obtained information that dissipated their earlier probable cause, then any search and

detention after that point would not be reasonable or justified." Plaintiffs also contend that defense counsel's closing statements that Defendants had been permitted to remain in the home to look for evidence of personal use, even after they had learned that no grow operation had existed compounded the likelihood of jury confusion.

"We review a district court's decision to give a particular jury instruction for abuse of discretion, but we review de novo legal objections to the jury instructions." Lederman v. Frontier Fire Prot., Inc., 685 F.3d 1151, 1154 (10th Cir. 2012) (internal quotation marks omitted). "We do not decide whether the instructions 'are flawless, but whether the jury was misled in any way and whether it had a[n] understanding of the issues and its duty to decide those issues.'" Id. at 1155 (quoting Brodie v. Gen. Chem. Corp., 112 F.3d 440, 442 (10th Cir. 1997). "[S]o long as the charge as a whole adequately states the law, the refusal to give a particular requested instruction" is not grounds for reversal. Id. "If we determine that the trial court erred, we must then determine whether the error was prejudicial" to the moving party. Id.

For the reasons set forth in the last section, we disagree with Plaintiffs that the prior panel's discussion of dissipation was "law of the case." The district court's instruction "fairly, adequately and correctly state[d] the governing law and provide[d] the jury with an ample understanding of the applicable principles of law and factual issues confronting them." Id. at 1154–55. Moreover, the district court instructed the jury that statements of counsel were not evidence and all the legal

47

standards they were to use all contained in the instructions. We conclude the district court did not err.

## III.

For the foregoing reasons, we AFFIRM IN PART, REVERSE IN PART, and REMAND for further proceedings consistent with this opinion.